IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA, )
)
Plaintiff, )
)
vs. ) Case No. 24-CR-24-RAW
)
JORDAN FRANCIS TOYNE, )
)
Defendant. )

TRANSCRIPT OF PROCEEDINGS

JANUARY 21, 2025

BEFORE THE HONORABLE RONALD A. WHITE

UNITED STATES DISTRICT JUDGE

JURY TRIAL - VOLUME I

APPEARANCES:

FOR THE PLAINTIFF: NICOLE PALADINO
EMILY C. WITTLINGER
Office of United States Attorney
520 Denison Avenue
Muskogee, Oklahoma 74401

FOR THE DEFENDANT: THOMAS M. WRIGHT
Wright, Stout & Wilburn
P.O. Box 707
Muskogee, Oklahoma 74402

REPORTED BY: JOANNA SMITH, CSR, RPR
United States Court Reporter

INDEX


| | PAGE |
|---|---|
| Jury sworn | 3 |
| Opening Statement on behalf of the Government by Ms. Wittlinger | 11 |
| Opening Statement on behalf of the Defendant by Mr. Wright | 18 |
| WITNESSES ON BEHALF OF THE GOVERNMENT | |
| A.S. | |
| Direct Examination by Ms. Paladino | 24 |
| Cross-Examination by Mr. Wright | 55 |
| Redirect Examination by Ms. Paladino | 69 |
| E.A. | |
| Direct Examination by Ms. Paladino | 75 |
| Cross-Examination by Mr. Wright | 106 |
| Redirect Examination by Ms. Paladino | 115 |
| Recross Examination by Mr. Wright | 117 |
| RHONDA AUDETTE | |
| Direct Examination by Ms. Paladino | 118 |
| Cross-Examination by Mr. Wright | 130 |
| Redirect Examination by Ms. Paladino | 134 |
| JARRICK SNYDER | |
| Direct Examination by Ms. Wittlinger | 138 |

PROCEEDINGS

JANUARY 21, 2025:

THE COURT: All right. We're on the record in CR-24-24, the United States of America versus Jordan Francis Toyne.

Ms. Nicole Paladino and Ms. Emily Wittlinger are present for the government. Mr. Thomas Wright is present for the defendant. Mr. Toyne is present in the courtroom.

This matter comes on today for trial.

Is the government ready for trial?

MS. PALADINO: The United States is ready, Your Honor.

THE COURT: Is the defendant ready for trial?

MR. WRIGHT: Yes, Your Honor.

THE COURT: Thank you. Ladies and gentlemen, my name is Ronald White. I am chief judge for the United States District Court for the Eastern District of Oklahoma. I appreciate Magistrate Judge Snow overseeing your selection as jurors, but I will be your judge for the rest of the trial.

During the jury selection process, I think you were given a number of oaths. You're going to need to stand and give one more oath before we start. So if you would please stand and raise your right hand.

(Jury sworn.)

THE COURT: Thank you. You may be seated.

Members of the jury, now that you've been sworn, I will give you some preliminary instructions to guide you in your participation in this trial. It is very important to the administration of justice that you fully understand and faithfully perform these duties. You will probably recognize some of these instructions that the magistrate gave you during the jury selection, but they're important that you listen to them again.

It is my duty to determine all of the law applicable to this case and to inform you of that law by these instructions and by the instructions that I will give you after all the evidence has been received. It is your duty to accept and follow all of these instructions as a whole, not accepting one or more of these instructions and disregarding the others. It will be your duty to determine the facts in this case from the evidence presented by the parties in open court. You and you alone are judges of the facts. You will then have to apply those facts to the law as I will give it to you. You must follow that law whether you agree with it or not. You should not allow sympathy or prejudice to influence your decision. Your decision should be based upon probabilities and not possibilities. It may not be based upon speculation or guesswork.

Now, nothing I may say or do during the course of this

trial is intended to indicate or should be taken by you as indicating what your verdict should be. The evidence from which you will determine the facts will consist of the testimony of witnesses, documents, and other items received into the record as exhibits, and any facts to which the attorneys agree or stipulate or that I may instruct you to accept as true.

Now, the production of evidence in court is governed by rules of law. Attorneys have an obligation to their clients to make an objection when they believe that the evidence being offered is improper under the rules governing evidence, and it is my duty to rule on these objections. You should not be influenced by the objection or by my ruling on it. If I say the objection is sustained, ignore the question. If I say the objection is overruled, you may consider the testimony or evidence covered by the objection. If you are instructed that some item of evidence is received for a limited purpose only, you must follow that instruction as well.

Now, certain things are not evidence and must not be considered by you. These things include, one, statements, arguments, and questions by the attorneys. These are not evidence. The statements, arguments, and questions of the attorneys are intended to help you in understanding the evidence and applying the law, but they are not evidence

themselves. If any statement, argument, or question of an attorney has no basis in the argument, then you should disregard it.

Two, the attorney's objections and my ruling on these objections, together with the reason for these objections and rulings, are not evidence and should not be considered by you.

Three, testimony that I exclude or tell you to disregard is not evidence and must not be considered.

And four, anything you may have seen or heard outside the courtroom is not evidence and must be disregarded. You are to decide this case solely on the evidence presented here in the courtroom.

Now, you might notice that we have open quarters out here. Everyone can mix together. These lawyers know my rules. My rules are that they are not to speak to you. So if they ride up the elevator with you and don't speak with you, they're not being unfriendly. They're just following my rules. The reason for these rules is this. We not only want to do justice here, we want to give the perception of doing justice. If anyone sees one of you talking to one of these lawyers, they're going to immediately wonder, wonder what they're talking about. So that's why they don't talk to you, and that's why you shouldn't talk to them.

Now, there are two kinds of evidence, direct and

circumstantial. Direct evidence is direct proof of a fact, such as testimony of an eyewitness. Circumstantial evidence is proof of facts from which you may infer or conclude that other facts exist. I will give you further instructions on these as well as other matters at the end of the case, but keep in mind that you may consider both kinds of evidence, both direct and circumstantial.

It will be up to you to decide which witnesses to believe, which witnesses not to believe, and how much of any witness's testimony to accept or reject. I will give you some guidelines for determining the credibility or believability of witnesses at the end of the case.

Never mind.

Now, this is a criminal case. You must presume that the defendant is innocent of the crime with which he is charged. Thus, the defendant, although accused of a crime in the indictment, begins this trial with a clean slate, with no evidence against him. The burden is always upon the government to prove guilt beyond a reasonable doubt. This burden never shifts to the defendant, for the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence. The defendant is not even obligated to produce any evidence by cross-examining the witnesses for the government. In short, ladies and gentlemen, the defendant is not required

to prove he is innocent. It is up to the government to prove guilt beyond a reasonable doubt.

Now, it's not required that the government prove guilt beyond all possible doubt. The test is one of reasonable doubt. A reasonable doubt is a doubt based upon reason and common sense, the kind of doubt that would make a reasonable person hesitate to act. Proof beyond a reasonable doubt must, therefore, be proof of such a convincing character that a reasonable person would not hesitate to rely or act upon it in the most important of his or her own affairs.

Those of you who are familiar with civil cases will have heard of proof by preponderance of the evidence. That burden of proof does not apply to a criminal case, and you should, therefore, put it out of your mind.

Now, I have a few words to you about your conduct as jurors. I'm sure Magistrate Snow went over these with you, but I want to do it again. I call them my usual instructions. I will give them at every break. You'll get tired of them by the end of the trial, but it's important I give them. First, I instruct you that during this trial, you are not to discuss this case with anyone or permit anyone to discuss it with you. Until you retire to the jury room at the end of the case to deliberate your verdict, you simply are not to talk about this case. If anyone should try to talk to you about this case, please bring it to the

Court's attention immediately.

Second, do not read or listen to anything relating to this case in any way. I doubt there will be media coverage of this case, but if there would be a newspaper story, put the paper down. If there would be a news story or a radio story, turn it off. You can rely only upon the evidence you hear here in open court.

Third, do not try to do any research or conduct any investigation about this case on your own. You know what I'm talking about. You can use your iPads and your iPhones and your digital devices to look up anything in 15 seconds. Don't do that. Don't research any of the evidence in this case. Don't research the lawyers in this case. And certainly, please don't investigate me.

Finally, do not form any opinion about this case until all the evidence has been presented to you. Keep an open mind until you start your deliberations at the end of the case. Now, a question sometimes arises as to whether individual members of the jury can take notes during the trial. If you'll look around inside the jury box, you'll see there are no notes -- no notepads or pencils. That's because I'm one of the judges who don't allow note-taking. Some judges do. First of all, this case is short. It will be short. It will be a couple days and don't think you need to take notes.

Secondly, we don't want the one good note-taker -- there may be more than one, but you know what I mean. We don't want the one good note-taker, like you used to know in your school class, that would listen and take the notes and everyone would doze off knowing they'll get the notes from the good note-taker. We want you to listen to the evidence as it's being put on, and that's why I don't allow note-taking.

Now, the trial is about to begin. First, each side may make an opening statement. An opening statement is neither evidence nor argument. It is an outline of what that party intends to prove, offered to help you follow the evidence. Lawyers sometimes refer to an opening statement as a road map, because it's their opportunity to try to show you where they're going to go during trial.

After the opening statements, the government will present its witnesses, and the defendant may cross-examine them. Then the defendant will present any witnesses that they may have, and the government may cross-examine them. However, as I have -- as I have previously instructed you, the defendant is not required to present any evidence or put on any witnesses.

After all the evidence has been received, I will give you the instructions of the law. And after that, the lawyers will make their closing arguments. You will then

retire to deliberate your verdict.

Our general plan in this case is to start every morning at 9:00. That means we'll ask you to be here by 8:45. We'll take a midmorning break. We'll take lunch at around noon, and go for an hour and 15 minutes. We'll take a midafternoon break, and then hopefully get out of here by five. Don't hold me to that plan because things happen during a trial where we need to go a little longer or we take a break a little earlier. So just keep in mind that's the planned plan. It's not necessarily the real plan.

So that concludes the initial instructions, ladies and gentlemen, and it is now time for opening statements.

Ms. Wittlinger.

MS. WITTLINGER: "If you ever tell anyone what I do to you, they're never going to believe you because of who I am and the job that I have." These are the words of the defendant, who was a special agent with the Oklahoma State Bureau of Investigations in the Internet Crimes Against Children Division, at the same time as he was sexually abusing his best friend's minor daughter for years.

This defendant was trained to find perpetrators of sexual abuse. He was trained to protect children. Instead, he was touching a child's breasts. He was touching a child's vagina with his fingers and with his mouth. And he was putting his adult penis inside a child's vagina. This

child is A.S. She was just 13 years old the first time the defendant put his hands inside of her underwear.

Now, at that time, the defendant was like family to A.S. Her father and the defendant had been best friends since high school. And they were so close that A.S. called the defendant her uncle, and he referred to her as his niece. The defendant should have been someone that A.S. could look up to, someone who would take care of her, someone who would protect her. But instead, he made her childhood a nightmare, and it's a nightmare that she's still facing today.

A.S. is going to be here today. And this will be the first time that she's going to publicly speak about the abuse that she suffered at the defendant's hands. She's 18 years old now. But the defendant began his abuse of A.S. when she was just 13 on a family vacation.

Now the defendant took A.S. with his family on a vacation to the Marval Resort in Gore, Oklahoma. While they were there, A.S. was sitting on the couch next to the defendant, and they were watching a movie. As they were sitting there, the defendant took his hand and he placed it on A.S.'s thigh. Then he moved his hand up her thigh, he put it inside of her shorts, and then he put it inside of her underwear.

Now on that same trip, while the defendant was swimming

with A.S., he repeatedly slid his hands inside of her underwear. But this was only the beginning of the abuse that he was going to perpetrate on her for the coming years.

Soon after that trip, during A.S.'s fall break, the defendant asked A.S.'s father if A.S. could come over and babysit the defendant's children on her break. And during that week, A.S. spent the night at the defendant's home. And during those days and nights when A.S. was at the defendant's home, the defendant would wait until his wife was away at work and his children were occupied in other rooms, and then he began to touch A.S.'s breasts. He touched her vagina, and he put his fingers inside of her vagina.

He continued to abuse A.S. in this way for the coming months. And then he would find excuses, more reasons for her to come over to his home, continue to touch her. And in addition to the touching with his hands, he began to put his mouth on A.S.'s vagina. The defendant abused A.S. in this way for more than a year. And then after over a year had passed, he escalated his abuse, and he put his adult penis inside of A.S.'s vagina.

The defendant abused A.S. over and over again. Now A.S. felt that she had no choice but to keep this abuse a secret because the defendant manipulated her and he threatened her. The defendant manipulated A.S. into

thinking that he had romantic feelings for her. He told her that he loved her and he cared for her. The defendant, a 37-year-old man, told A.S. that if he weren't married, she would be his girlfriend. He said this to a 13-year-old child. And at the same time that he was professing his love for A.S., he was telling her, if you tell anyone about this, I'm just going to lie and say it never happened. He also told A.S. that if she told anyone what he was doing to her, she would ruin his family. She would ruin his life. She would ruin their family's relationships. And she would ruin his job.

Now let's talk about what the defendant's job was. Like I said, he was a special agent with the Oklahoma State Bureau of Investigations. But he wasn't just any special agent. He specifically worked to investigate crimes of child sexual abuse. So he saw firsthand every day the mistakes that predators can make that get themselves caught. And so he knew that even though he was communicating with A.S., he made sure never to send her any sort of sexual or inappropriate text messages, images, photos, because every day he saw those things. He saw when perpetrators can get caught by those types of communications.

But he also saw every day the types of manipulation and control that predators use to keep their victims in terrified silence. And these are the same tactics the

defendant used to keep A.S. quiet for all those years. And because of the fear and the manipulation that this defendant inflicted upon A.S., she was forced to live with secrets that no child should have to bear.

Eventually, it became too much for A.S. to bear. And when she was 16 years old, she told her parents what the defendant had been doing to her.

Now, you're going to hear from A.S.'s father, Jarrick Snyder. Jarrick Snyder was devastated to find out that his best friend of over 25 years that he loved and he trusted with his own daughter had been sexually abusing her all of that time. And when A.S. told her father what the defendant had been doing to her, Jarrick immediately cut off the defendant's access to A.S., the defendant's access to their family. He never spoke to him again. And he reported the defendant to the police immediately. Jarrick did that despite knowing this man for over 25 years.

But A.S.'s family isn't the only family that this defendant has destroyed, because A.S. is not the only child he sexually abused. This defendant has sexually abused his own sister-in-law, E.A. E.A. is 19 years old now, and you're going to hear from her. But when she was just 15, the defendant, in the same way that he did with A.S., would slide his hands onto her butt while they were swimming together on family vacation. And then he took advantage of

her one night when she was spending the night at his house. The defendant waited until his wife went to bed, and then he began to talk to E.A. about sex. Then he started playing a sexual game of truth or dare with her. And the defendant, E.A.'s brother-in-law, a grown man, dared 15-year-old E.A. to take off a piece of her clothing. Now, E.A. refused. And when she did that, the defendant said, "Oh, you're lame," and he started to touch her thigh. E.A. tried to get up and leave, and the defendant slid his hand up her thigh and touched her butt.

Now, E.A. was able to get out of that room. She went and she hid in the defendant's son's bedroom for the rest of that night to get away from her brother-in-law. That was the only place she felt that she could be safe from him. And you'll hear that the only reason the defendant stopped his abuse of E.A. after that night is because E.A. courageously told her mom what the defendant had done to her. And her mom, Rhonda Audette, made sure the defendant was not alone with her ever again.

Rhonda also told E.A. to write down exactly what the defendant had done to her in her journal. And E.A. did just that. And today, you're going to hear about E.A.'s 2021 journal entry.

Now, while the abuse of E.A. and A.S. began in very similar ways, each of these children responded differently.

You're going to hear from an expert, Vicki Boan. She's an expert in the process that children go through when they're speaking about the sexual abuse that they've undergone. She's interviewed thousands of children. And she'll tell you that it is very common for some children, like A.S., to wait years before they speak about what they're going through. But some, like E.A., tell very soon after it happens.

She'll also tell you that it's common for children, when they start talking about the abuse that they've suffered, to remember different details over time because that disclosure is a process. Ms. Boan is also going to tell you that it is especially common for children to keep their abuse a secret, when the perpetrator is someone that they know and trust, and someone that their family knows and trusts. That is exactly the situation that A.S. and her family were in with this defendant.

Now, today is going to be the first time that A.S. is facing the defendant since she told her parents of his abuse. It's going to be difficult for her to speak about it. It's going to be difficult to hear. But you're going to have all of the evidence that you need to hold the defendant accountable for the sexual abuse that he perpetrated on A.S., when she was 13 years old, abuse that he continued until she was 16.

And at the end of this trial, we will ask that you find

this defendant guilty.

THE COURT: Mr. Wright.

MR. WRIGHT: May it please the court, counsel, ladies and gentlemen of the jury. Thank you for agreeing to serve on this jury. You learned this earlier, but I'm going to reintroduce myself. My name is Tom Wright. I'm an attorney here in Muskogee. And I have the privilege of representing Jordan Toyne. This case is about a young lady who was getting a stern talking to by her parents, so much so that she had a panic attack. And to deflect the attention from her, she made up a story about Jordan Toyne to get herself out of trouble.

Jarrick Snyder and Jordan Toyne were best friends since high school. Jordan grew up in the Catoosa -- I'm sorry -- in the Cookson area of Sequoyah County, and he went to Keys High School. He's had a lifetime of service to his community, to his state, and to his nation. At age 15, when Jordan Toyne was in high school, he became a volunteer firefighter for the Snake Creek Wilderness Volunteer Fire Department. He was so young that his mom had to take him to fires. He graduated from Keys High School in 2007. He began his college career at the University of Kansas and then transferred to Northeastern State University in Tahlequah. He graduated with a degree in biology and a minor in chemistry.

In 2009, while he was at NSU, he became a police officer for NSU, and he served in the NSU Police Department from 2009 to 2012. He worked for the Bureau of Prisons as a corrections officer at the Federal Transfer Center in Oklahoma City from 2012 to 2017. He was a game warden for the Oklahoma Department of Wildlife in Okmulgee from 2017 to 2019. And while he was there, he had a part-time job where he was actually a courtroom security officer in this courthouse, the people that wear the blue blazers. He worked here doing that.

In 2019, he got hired by the Oklahoma State Bureau of Investigation, the OSBI. He started out in their major crimes division, and eventually he transferred over to the Internet Crimes Against Children, or ICAC, division.

He served in the military since 2012. He attended basic training at Fort Benning in Georgia -- I'm sorry -- North Carolina. He's been a second lieutenant, a platoon leader, an executive officer, and a civil affairs captain.

He is married. He has four sons. And his family is the most important thing to him. Second would be the military. He and Jarrick Snyder were best friends in high school, and they remained friends after high school.

Jarrick and his wife adopted three children, and the oldest was A.S. Jordan was like an uncle to A.S. She called him Uncle Jordan. She was shy, and she had trouble

opening up to adults. Her parents were strict. They had apps on her phone. They had cameras in their house. She had difficulty opening up to them, but she was more comfortable opening up to Jordan and his wife, Julie. She could open up to them, and so Jarrick and Brittany encouraged her to communicate with Jordan and Julie. He was her emergency contact at school, Jordan was.

Now, Jordan and Julie both worked. Jordan worked during the week, Monday through Friday, at OSBI. Julie worked during the week when they lived in McAlester at Lowe's. So whenever the kids weren't in school, at fall break, Christmas break, spring break, sometimes in the summer, and Jordan and Julie had to go to school, A.S. would come down, and she would babysit their kids for them. They had four sons.

In January of 2023 -- I'm sorry, in March of 2023, A.S. had been acting out at school. Jarrick and Brittany were getting on to her, and she was having a panic attack. And during this panic attack, she decided to blame Jordan. She wanted to deflect the attention from her and said he had been touching her since she was 13. The attention was immediately no longer on her.

Her dad was in law enforcement. He called the police. He made a report. The police came out the next day, and she made a report, and the investigation began there. And it

was a very thorough investigation. The government searched A.S.'s phone and found nothing inappropriate between she and Jordan. They subpoenaed Jordan's Facebook records, which included 17,567 pages. And in those pages, they found nothing inappropriate between Jordan and A.S.

They found messages of him sharing Pokemon and Harry Potter and memes and Star Wars. Nothing was inappropriate.

They seized Jordan's laptop, which had 929,994 artifacts on it, but nothing that was relevant to this case.

They seized his work phone, which had 387,495 artifacts on it, but nothing that was relevant to this case.

They seized multiple cameras and found nothing relevant.

They did seize a phone that had pictures of A.S. on it. It was her playing with the family dog and her sitting in the kitchen and her with Julie's sisters.

They seized Jordan's phone. They found 780,387 artifacts, 162,244 media files, and 38,143 communications. None of them were with A.S., and nothing was relevant to this case.

Now, they did find some things that are relevant to this case and that we're going to be up front with you about. Jordan visited pornographic websites, and they found this on his phone. But they were all adult websites. They were all appropriate for age-wise. They found

communications with other women. Jordan did talk to women that were not his wife. And you're going to see those, and we're going to talk about those. And you're going to see the tone of those messages and compare them to the tone of the messages with A.S.

You will see messages with A.S. where he's being a father figure. He's supporting her. He's being an uncle. And you'll see messages with women that he was attracted to. And you'll see the difference with those. You will hear from Jordan's sister-in-law, E.A. And she will say that Jordan was inappropriate in the living room, that he came over on the couch and touched her leg and touched her inappropriately, and that she immediately told her sister, Julie, about this when they were driving home the next day. And Julie said, you know what? We have cameras in our living room. Let me look at the cameras, let's see what's going on, and if something is wrong, we'll do something about it. So Julie went home. You'll hear from Julie. She looked at the cameras. Jordan and E.A. never even sat on the same couch together. She checked the cameras. She's going to testify, and she's going to tell you about that.

You'll hear from A.S. She will tell you that Jordan first touched her in a room full of people. You heard about sitting on the couch and watching a movie. What you didn't hear was there were seven other people in that room, and

nobody in that room saw any of this happen.

You heard about the swimming pool at Marval, which is in Gore, in July and August of 2020, 2021, and 2022, their busiest time, in a pool full of people that included Jordan's kids, Jordan's wife, other friends, family. No one saw any of this happen.

You will hear from Jordan. He's going to testify. He will tell you what happened. He has dedicated his life since he was 15 years old to serving his community and his state and his nation. He did not do any of the things that he's accused of. You will see that in the evidence. You will hear from Jordan.

And at the end of this trial, I'll get to talk to you guys again, and I'll ask you to find Jordan Toyne not guilty because he's innocent. Thank you.

THE COURT: All right. Ms. Paladino, I think before you have invoked the Rule of Sequestration.

MS. PALADINO: That's right, Your Honor.

THE COURT: Ladies and gentlemen, the Rule of Sequestration has been invoked. That's simply a big lawyer phrase meaning that if you're going to testify in this case, you can't be in the courtroom right now. You can only be in here when you're testifying. So if any of you are going to testify, please wait outside and don't talk to any of the other witnesses. I'll trust counsel to help me police it

because I don't know what your witnesses look like.

And then I believe there are going to be preadmission of two exhibits.

MS. PALADINO: That's right, Your Honor. The government would move to enter Government's Exhibit 1 and 4.

THE COURT: Mr. Wright?

MR. WRIGHT: No objection, Your Honor.

THE COURT: Government's Exhibits 1 and 4 will be admitted.

Ms. Paladino, you may proceed with your first witness.

MS. PALADINO: The United States calls A.S.

A.S.,

having first been duly sworn, was called as a witness and testified as follows:

DIRECT EXAMINATION

BY MS. PALADINO:

Q. Hello, A.S. Would you please tell us your full name?

A. A.S.

Q. And can you spell that for us?

A. ***********************.

Q. Okay. And just a couple of housekeeping things. So we have a court reporter in here with us. She's taking down every single thing that we say to create a good record. Okay? So it's really important that you get close to the microphone and speak really loud so that everyone can hear

you. Okay? What is your date of birth?
A. ***********, 2006.
Q. How old are you as you sit here today?
A. I'm 18.
Q. And are you a registered member of the Cherokee Nation?
A. Yes.
Q. So do you have a quantum or certificate degree of Indian blood?
A. Yes.
Q. And where do you live?
A. Owasso.
Q. Who do you live with?
A. My parents and my brothers.
Q. What are their names?
A. Brittany and Jarrick, and then P.S. and C.S.
Q. So is Brittany your mom?
A. Yes.
Q. And Jarrick your dad?
A. Uh-huh.
Q. Okay. Where do you go to school?
A. Owasso High School.
Q. What grade are you in?
A. I'm a senior.
Q. Are you excited to graduate this year?

A. Yeah.
Q. What plans do you have for college?
A. I'm going to go to TCC to get my basics, and I'm going to go to UCO afterwards.
Q. And what line of study are you interested in pursuing?
A. Forensics and psychology.
Q. You told me who all you live with, and you mentioned your dad, Jarrick.
A. Uh-huh.
Q. Did your dad have a best friend that was like an uncle to you that you guys no longer speak to?
A. Yes.
Q. Who is that?
A. Jordan Toyne.
Q. And how long have you known the defendant, Jordan Toyne?
A. Since I was 9.
Q. How was he introduced to you?
A. We met him right after we moved in with my mom and dad.
Q. And did -- was he introduced to you as your uncle?
A. Yes.
Q. For as long as you've known him since you were 9, have you called him Uncle Jordan?
A. Yeah.

Q. Who is in the defendant's family?
A. His wife, Julie, and his four kids.
Q. What are their names?
A. A.T., R.T., S.T., and J.J.T.
Q. And when you say A.T., is that A.T.?
A. Yes.
Q. What's the first -- or where is the first address that you remember the defendant living at?
A. Okmulgee.
Q. And did you ever stay the night in Okmulgee?
A. No.
Q. What's the next address that you remember the defendant living at?
A. McAlester.
Q. And would that have been *********** in McAlester?
A. Yeah.
Q. And there should be an exhibit binder there in front of you. Government's Exhibit 1. And this has been preadmitted.

MS. PALADINO: If we could please publish Government's Exhibit 1.

Q. (By Ms. Paladino) Is this *********** in McAlester, Oklahoma?
A. Yes.
Q. And is this the address that the defendant moved to in

2019?
A. Yes.
MS. PALADINO: Okay. We can take that down. Thank you.
Q. (By Ms. Paladino) So based on your birthday, did you turn 13 in ******** of 2019?
A. Yes.
Q. How old were you when the defendant moved from that address?
A. I would have been 16.
Q. Okay. So the defendant lived here from the time you turned 13 until you turned 16.
A. Uh-huh.
Q. You have to say yes.
A. Yes.
Q. Yes or no, so that the court reporter can be clear. So you said that you did not stay in Okmulgee, but that at some point, did you start spending more time with the defendant when he moved to McAlester?
A. Yes.
Q. Why was that?
A. To babysit his kids.
Q. And what other things would you do with his family?
A. We went camping.
Q. Where did you go camping?

A. Gore.
Q. Did that resort have a name?
A. Marval.
Q. And can you describe that campground for us?
A. There's cabins, places for your campers, pools, trails.
Q. And when you say trails, are those trails that people can go walking?
A. Yeah.
Q. And so would you go with -- or who would you go with to Gore with the defendant? Who all would go?
A. His family and sometimes mine.
Q. Did Julie's family sometimes go as well?
A. Yes.
Q. Did something happen at Marval in the summer of 2020 when you were 13 that made you uncomfortable?
A. Yeah.
Q. And would that have been the summer before eighth grade?
A. Yes.
Q. What happened?
A. He touched me in the pool.
Q. Okay. And we'll get more into the details of that. But first, tell me who all was on this specific trip at Marval?

A. Him, Julie, the four boys, and E.A. and A.A.
Q. And who are E.A. and A.A.?
A. Julie's sisters.
Q. So would that be the defendant's sister-in-laws?
A. Yes.
Q. And how old are they in relation to you?
A. A little bit older and a little younger.
Q. Okay. So who's a little bit older than you?
A. E.A.
Q. And when you say a little bit older, is she like a few months older, a few years?
A. A few months, yeah.
Q. And then A.A. is younger than you?
A. Yeah.
Q. Okay. So you're all at Marval, and you said the defendant touched you in the pool?
A. Yes.
Q. Tell me about that.
A. He was kind of just throwing me around, and his hand slipped in my shorts.
Q. Okay. Were you swimming in shorts?
A. Yes.
Q. And did you have panties on?
A. No, I had swim bottoms on.
Q. Okay. And so you said he was throwing you?

A. Uh-huh.
Q. And his hand slipped in your shorts. Did it touch your vagina?
A. Uh-huh. Yes.
Q. And was that skin to skin?
A. Yes.
Q. But at that time, did his hand go inside your vagina?
A. No.
Q. Was that confusing to you?
A. Yes.
Q. Did you say anything?
A. No.
Q. And on that same trip, what else happened?
A. We were watching a movie. We were on the couch with E.A. and A.A. We were under a blanket, and his hand was on my thigh, like in between my legs. And he thought I was asleep, and he slipped his hand into my pants.
Q. Okay. Let's walk that back just a little bit. So you said you're on the couch?
A. Uh-huh.
Q. And so who all is on the couch?
A. Me, him, E.A., and A.A.
Q. And so lay that out for us. Who was sitting where?
A. It was me, him, E.A., and A.A.
Q. Okay. So no one was between you and the defendant?

A. No.
Q. And no one was on the other side of you?
A. No.
Q. Were you under a blanket?
A. Yes.
Q. And was the defendant also under the same blanket?
A. Yes.
Q. So, obviously, there were people in the room with you guys.
A. Uh-huh.
Q. Would they have been able to see his hand or was it covered by the blanket?
A. It was covered.
MR. WRIGHT: Objection. She wouldn't know what somebody else could see.
THE COURT: Overruled.
Q. (By Ms. Paladino) You can answer that.
A. It was covered.
Q. Okay. And so you said he put his hand -- well, first, you said that -- you told us that he thought you were asleep. Why do you think that he thought you were asleep?
A. I don't think he would have done it if I was awake.
Q. And were you awake?
A. Yes.
Q. What were you doing that would let him feel like you

were asleep?
A. I was laying down.
Q. On him?
A. Yeah.
Q. Where was your head?
A. I think it was like on his shoulder.
Q. Okay. So he puts his hand on your thigh, and then he said -- he slid it into your shorts?
A. Uh-huh.
Q. So did he touch your vagina?
A. Yes.
Q. Skin to skin?
A. Yes.
Q. But again, did he not go inside your vagina at that time?
A. Yeah.
Q. Is that a no -- I know you said yes. Sorry, that was a bad -- poorly worded question. Did he go inside your vagina at that time?
A. No.
Q. No. Okay. Did that confuse you?
A. Yes.
Q. And, obviously, you're 18 now, but at the time that this happened, when you were 13, did you understand what was happening?

A. No.
Q. Is that all that happened at Gore on that trip?
A. Yes.
Q. Okay. So you go home. You don't disclose. You start the eighth grade. When is the next time in the school year that you go to the defendant's house?
A. I think it would have been fall break.
Q. Okay. So fall break of your eighth grade year?
A. Yes.
Q. And what was your understanding of why you were going to the defendant's house?
A. To babysit.
Q. And would that have been all four of his kids?
A. Yeah.
Q. So on these babysitting trips during school breaks, would you stay for multiple days at a time?
A. Yes.
Q. Did the defendant's touching of you progress when you got to his house for fall break?
A. Yes.
Q. How so?
A. There was more touching.
Q. Where would he touch you?
A. My boobs, my vagina.
Q. Okay. Is this hard to talk about? There's some

tissue up there and if you need a break. Just take a deep breath. We're going to keep moving through this. Okay? So you said that he would touch you. I think you said your boobs. Remember, we've got to speak up really well. Okay?
A. Uh-huh.
Q. Where else other than your boobs?
A. My vagina.
Q. And when he would touch your boobs and your vagina, would that be skin to skin, over your clothes, or both?
A. Both.
Q. And did that just sort of happen in passing, any time he got a chance, or was it one isolated event or something else?
A. It was just pretty much whenever he could.
Q. Kind of hard to understand you.
A. It was whenever he could.
Q. Okay. So whenever he had an opportunity?
A. Yes.
Q. Where would Julie and the kids be when these things would happen?
A. Julie was usually at work, and the boys were in their rooms.
Q. So were there times where he wouldn't have been able to do, you know, something, touching, because the kids would be around?

A. Yes.
Q. But then sometimes they wouldn't be around, so he could touch your boob or your vagina or whatever?
A. Yes.
Q. Did he kiss you?
A. Yes.
Q. How did he kiss you?
A. Just kind of forcefully.
Q. Did he use his tongue?
A. Yeah.
Q. What did the defendant tell you when he would touch you like this?
A. He would tell me that he loved me.
Q. Did he tell you not to tell?
A. Yes.
Q. What did he say about not telling anyone?
A. He said that I couldn't tell anyone because it would ruin his life.
Q. What did you understand his job to be at that time?
A. He worked for OSBI.
Q. And do you know what OSBI is?
A. Oklahoma State Bureau of Investigation.
Q. So is that a law enforcement job?
A. Yes.
Q. Did he tell you that no one would believe you because

of his job?
A. Yes.
Q. How did that make you feel when he would tell you that?
A. Just defeated.
Q. Did you feel like you could disclose at that time?
A. No.
Q. What were you worried about would happen to your own family if you told?
A. I didn't want my dad to lose his best friend.
Q. How long, if you know, had your dad and the defendant been best friends?
A. About 20 years.
Q. Did he touch you in all different places around the house or just in one place in the house?
A. All different places.
Q. And so at this time on that fall break, did he keep it limited to just hands touching your vagina and your breasts?
A. Yes.
Q. When he would put his fingers inside your vagina, how did that feel?
A. It hurt.
Q. Did you tell him that it hurt?
A. Yes.
Q. And what would he do when you told him it hurt?

A. He would stop.
Q. Did he ever ask you to touch him?
A. No.
Q. Okay. So I also want to ask you about E.A. again. So you mentioned that E.A., his sister-in-law that's a little bit older than you by a couple months, had been out at the Gore campsite.
A. Yes.
Q. Did you ever see her around the house during the same time period when you were in the eighth grade?
A. Sometimes.
Q. Okay. Did E.A. stop coming over early in 2021?
A. Yes.
Q. Did things progress with the defendant's touching in the summer of 2021 before you started ninth grade?
A. Yes.
Q. What happened -- or what's the next incident that you can remember? Were you back at Gore, were you at the house, or something else?
A. I think it would have been back at Gore.
Q. So tell us about that trip.
A. It was me, his family, and I think it would have been Stephanie and her boys.
Q. Okay. And did you guys spend just a couple of days at Marval and then go back to the defendant's home?

A. Yes.
Q. So did anything happen at Marval at that time?
A. Yes.
Q. Okay. And what happened?
A. Just more touching, more stuff in the pool.
Q. Okay. And tell me about Marval and Gore when you were with the defendant on these trips. Would you guys ride into town from the campsite alone?
A. Sometimes, yeah.
Q. Did you guys take walks alone?
A. Yes.
Q. How did the defendant make you feel when you two would be alone together?
A. He made me feel special.
Q. What kind of things would he say to make you feel special?
A. That I was smart and pretty.
Q. And you mentioned earlier that he told you he loved you. Was that something he said regularly?
A. Yes.
Q. What did he say about how he would feel if he didn't have a wife?
A. He said if he didn't have a wife, then he would want me to be his girlfriend.
Q. Did he treat you like a girlfriend?

A. Yes.
Q. I know earlier you said that this was all really confusing for you because you were so young. Even though the defendant was treating you like a girlfriend, were you afraid of him?
A. Yes.
Q. Why were you afraid of him?
A. Because he is quite bigger than me.
Q. And what was his career experience up to that point?
A. He was in the military.
Q. And I know you mentioned he was a cop?
A. Yes.
Q. Did it -- did you think to yourself that if you told that he might could hurt you?
A. Yes.
Q. And did he repeat his admonitions about not telling because it would destroy his family, his life, and his career?
A. Yes.
Q. How did it progress from kissing and touching you with his fingers to more?
A. What do you mean?
Q. At some point, did the defendant start to touch you or progress in his touching? So I know you said he had kissed you. He touched your vagina with his finger. He touched

your boobs with his hands. Did he use his mouth at some point?
A. Yes.
Q. Tell us about that.
A. Julie had gone to work, and I was asleep on the couch. And he came to wake me up and told me to come to his room.
Q. And then what happened?
A. He started touching me. .
Q. How would he touch you?
A. With his fingers and his tongue.
Q. And was his tongue on your vagina skin to skin?
A. Yes.
Q. So then you go on to start ninth grade. So would you have gone back for fall break like the years before?
A. Yes.
Q. And this was when you were 14?
A. Yeah.
Q. At some point, did the defendant try to use his penis?
A. Yes.
Q. Tell us about that.
A. I was in J.J.T.'s room, and it was like the middle of the night. And he came to wake me up, and he dragged me on the floor and pulled my pants down.
Q. And what did he do after that?
A. He tried to penetrate me.

Q. And so is that his penis in your vagina?
A. Yes.
Q. And did it -- was it able to go all the way in?
A. No.
Q. What happened?
A. I told him that it hurt.
Q. And what did he say?
A. He just stopped.
Q. Between fall break and Christmas that year, would you have turned 15?
A. Yes.
Q. Did you return to McAlester over Christmas break?
A. Yes.
Q. What did the defendant do with his penis during that break?
A. He penetrated me.
Q. And was he successful that time?
A. Yes.
Q. How did that feel?
A. It hurt.
Q. Did it hurt the entire time?
A. Yes.
Q. But unlike the other times, did the defendant continue?
A. Yes.

Q. How did you know that that was over?
A. When he got up and left.
Q. And tell me where you were in the house when this happened.
A. We were in his bedroom.
Q. Does his bedroom have a bathroom?
A. Yes.
Q. So where did he go when he got up?
A. He went to the bathroom.
Q. Where did he finish?
A. In me.
Q. And so did you have a mess to clean up or something else?
A. No.
Q. Why not?
A. He had a condom on.
Q. And why did he say he used a condom?
A. He was afraid of getting me pregnant.
Q. And had he already told you that he had was -- had had a vasectomy and was fixed?
A. Yes.
Q. What did he say about still being afraid of getting you pregnant?
A. He didn't want to risk it.
Q. Where did he get this condom from?

A. I believe it was a Walgreens.
Q. And how do you know that?
A. He told me.
Q. And where was everyone in the house when this incident happened?
A. Julie was at work and the kids were in their rooms.
Q. And was this a long, drawn out incident or was it quick?
A. It was pretty quick.
Q. You said Julie was at work and the kids were in their rooms. Is that the same as -- the status of the house during all the other sex acts?
A. Yes.
Q. Did the defendant continue to sexually abuse you on occasions after that initial penetration?
A. Yes.
Q. And was he successful in penetrating your vagina with his penis again or was that the only time?
A. That was the only time.
Q. Other than his penis in your vagina, did everything else continue?
A. Yes.
Q. Were you there for spring break in 2022?
A. Yes.
Q. And what did he do to you during that trip?

A. Pretty much the same stuff.
Q. So I know you said penis penetration didn't happen again, but what did he do? You say -- I know you're saying the same old stuff, and I know it's really difficult to talk about this, but I need you to say it. Okay?
A. He used his fingers and his mouth.
Q. Did you guys all go back to Gore to the campsite in the summer of 2022?
A. Yes.
Q. And was Stephanie there? You mentioned Stephanie earlier. Who is Stephanie?
A. She was a friend of Jordan's.
Q. Was she around a lot in the 2022 year?
A. Yes.
Q. And you mentioned that she has kids. How many kids does she have?
A. Two.
Q. Do you know their names?
A. H.T. and D.T.
Q. And did you -- tell me about H.T. Did you two end up dating each other for a time?
A. Yes.
Q. Okay. So when you guys were all on this trip together, did the defendant still go on walks alone with you?

A. Yes.
Q. What else would you guys do alone?
A. We would go to town.
Q. Okay. So essentially he continued to treat you like a girlfriend?
A. Yes.
Q. Was there a time that you ever rode with the defendant to take his kids to their biological mom's house?
A. Yes.
Q. So you mentioned that the defendant has four boys earlier. Are all of those boys Julie's boys?
A. No.
Q. Which boys or boy belong to Julie?
A. J.J.T.
Q. So his other three boys, do they have a different mom?
A. Yes.
Q. So did you ride with the defendant to take the boys to their mom on one occasion?
A. Yes.
Q. And tell us about that.
A. When we dropped them off, he pulled off into, like, this really, like, abandoned place. It was like a park. It was really cold. There was snow. And he told me to get in the back seat.
Q. Did he get in the back seat with you?

A. Yes.
Q. And what happened in the back seat?
A. He used his fingers.
Q. Did he try to do more?
A. Yes.
Q. And what happened?
A. I told him it hurt and it was cold.
Q. Did he ultimately give up on that?
A. Yes.
Q. And then where did the two of you go when you left the park that had the water?
A. We went to my house.
Q. On these trips that you would take to the defendant starting when you were 13 up until you were 16, who would pick you up?
A. Most of the time it was just him.
Q. And when you say just him, do you mean the defendant?
A. Yes.
Q. Did Julie pick you up?
A. No.
Q. Were there occasions that your parents drove you out there?
A. Very rarely.
Q. Okay. And then did Jordan also bring you home?
A. Yes.

Q. And I know you mentioned just now that you guys dropped his boys off, so they obviously would have been in the car.
A. Uh-huh.
Q. Were there occasions that it was just you and the defendant when he would bring you home?
A. Yes.
Q. So I know we've talked about major incidents, but in between all of the big incidents, were there a bunch of little incidents over the years?
A. Yes.
Q. So what kind of stuff would your family do with the Toyne family?
A. We would go out to eat. We would be together for holidays.
Q. Did y'all often spend weekends together as well?
A. Yes.
Q. And did y'all sometimes go out to McAlester, and sometimes they came out to your house in Owasso?
A. Yes.
Q. How would Jordan treat you during all those instances?
A. Pretty much the same.
Q. Did he treat you like a girlfriend?
A. Yes.
Q. Did he ever touch you or kiss you in your house?

A. Yes.
Q. And where did that take place?
A. In my room.
Q. What was his reason for being in your room?
A. He wanted to check on me.
Q. Was anyone else in your room at the time?
A. No.
Q. At some point, did the defendant move to Broken Arrow and away from McAlester?
A. Yes.
Q. And did something come up that caused the defendant to go on a work trip of some kind?
A. Yes.
Q. What was it?
A. It was like a military thing.
Q. Did you understand the defendant would be coming back from that military assignment at some point?
A. Yes.
Q. Did that space from the defendant help you progress in disclosing to your parents?
A. Yes.
Q. How had keeping all of this inside you affected you up to that point?
A. It was really stressful.
Q. How -- in what ways did it manifest stress?

A. I started cutting myself.
Q. And did you have like high anxiety?
A. Yes.
Q. Did you want to tell your parents?
A. Yes.
Q. Were you scared?
A. Yes.
Q. Why were you scared?
A. Because I didn't want to hurt my dad.
Q. Were you afraid that they wouldn't believe you?
A. Yes.
Q. Had the defendant told you no one would believe you?
A. Yes.
Q. At the time, you described the defendant making you feel special, telling you that he loved you, all those types of things. As you sit here as an 18-year-old today, was any of that love or affection real?
A. No.
Q. How does it make you feel now?
A. Disgusted.
Q. I'm sorry, I didn't hear you.
A. Disgusted.
Q. So, on the night that you disclosed, were you having a heart-to-heart with your parents?
A. Yes.

Q. Were they upset with you about some teenage stuff going on?
A. Yes.
Q. And when did you make your disclosure in relation to that conversation?
A. After it was all over.
Q. So walk us through -- without saying what anybody said, what happened?
A. I was just kind of freaking out at them about something that had happened, and then I got in trouble, and then that's when I told.
Q. Okay. And so when you say you got in trouble, had you gotten a punishment?
A. Yes.
Q. And was it like a normal teenager punishment, something got taken away or something?
A. Yes.
Q. And so had that punishment come down before or after you disclosed?
A. Before.
Q. So why did you decide to tell at that point?
A. I couldn't keep it a secret anymore.
Q. And this behavior of acting out that they were discussing with you, was that related to the abuse that the defendant perpetrated?

A. Yes.
Q. Were you trying to figure out how to deal with all of this?
A. Yes.
Q. Was that difficult?
A. Yes.
Q. After you disclosed to your parents, did your punishment magically go away or did it remain?
A. No, it was still there.
Q. So, in other words, you didn't get out of any trouble?
A. No.
Q. What was your dad's reaction?
A. He was very surprised and sad.
Q. And did he report it to law enforcement?
A. Yes.
Q. And did you go do what's called a forensic interview the very next day?
A. Yes.
Q. I know that you had Snapchat, Instagram, all the social media that kids have; right?
A. Uh-huh.
Q. Did the defendant communicate with you on those platforms?
A. Yes.
Q. But was it always appropriate?

A. Yeah.
Q. Okay. And do you see the defendant, Jordan Toyne, in the courtroom right now?
A. Yes.
Q. Can you please identify him by pointing and describing something he's wearing?
A. A striped, like, black and red tie.
MS. PALADINO: Your Honor, if the record could reflect the defendant's --
THE COURT: She needs to point him out.
MS. PALADINO: Okay.
Q. (By Ms. Paladino) Can you point at him, please?
A. (Indicating.)
THE COURT: Thank you. Yes, the record shall so reflect.
MS. PALADINO: Thank you, Your Honor.
Q. (By Ms. Paladino) A.S., did this drastically impact your life in a negative way?
A. Yes.
Q. Did you want the defendant to put his finger in your vagina?
A. No.
Q. Did you want the defendant to put his mouth on your vagina?
A. No.

Q. Did you want the defendant to put his penis in your vagina?
A. No.
Q. Did your dad only lose a friend, but how did this affect your holidays and what you all did on the weekends and things like that?
A. It affected a lot.
Q. How so?
A. We were just alone. My dad didn't have his friend and we didn't have, like, that support.
Q. And so I think I heard you say you didn't have that support. So, like, what's a holiday you spent with the Toynes every year?
A. New Year's Eve.
Q. And so the first New Year's that came around after your disclosure, was that sad for everybody?
A. Yes.
MS. PALADINO: Your Honor, may I have just one moment?
THE COURT: Yes.
Q. (By Ms. Paladino) A.S., as you sit here, an 18-year-old, is this the hardest thing you've ever been through?
A. Yes.
Q. Okay. A.S., I have no further questions for you at

this moment. The defense attorney is going to get up and talk to you, and then I'll get back up and ask questions. Okay? And there's Kleenex there.

CROSS-EXAMINATION

BY MR. WRIGHT:

Q. A.S., you made these allegations in March 23rd of 2023; right?

A. Yes.

Q. And you had been having issues at school and acting out; right?

A. Yes.

Q. Your parents were cracking down on you on why this was happening.

A. Yes.

Q. And they were getting on to you; right?

A. Yeah.

Q. I think you said you were freaking out. Would that be like a panic attack?

A. Yeah.

Q. And during this panic attack and when you were getting in trouble from your parents, is when you claimed that Jordan did these things to you; right?

A. Yes.

Q. Now, the following day, a police officer responded; right?

A. Yes.
Q. Did you talk to that police officer?
A. Yes.
Q. He asked you questions?
A. Yes.
Q. Were your parents present when they talked to him?
A. Yes.
Q. Now, did they tell him your story or did you tell him your story?
A. I did.
Q. You did?
A. Uh-huh.
Q. And you told him that the last time that you had sex with Jordan was on December 21st of 2022?
A. Uh-huh.
Q. At his house in Broken Arrow; right?
A. I don't believe that's right, no.
Q. If you put that in the report, that would just be wrong?
A. I think that happened, like, the year before.
Q. Now, you said that Julie was at work; right?
A. Yes.
Q. What were Julie's work hours?
A. She usually went to work, like, really early in the morning, like six, and then she would be home by, like,

three or four.
Q. And she worked Monday to Friday; right?
A. Yes.
Q. And Jordan also worked Monday to Friday; right?
A. Yes.
Q. And the reason you were there is because the kids were on break, and somebody needed to watch them while Jordan and Julie went to work; right?
A. Yes.
Q. And that's what happened, right?
A. Uh-huh.
THE COURT: Is that a yes?
THE WITNESS: Yes.
Q. (By Mr. Wright) So when you would come down to McAlester to babysit, Jordan and Julie would go to work, and you would stay with the kids, right?
A. Yes.
Q. That's the point of you being down there; right?
A. Yes.
Q. You also had a forensic interview, where you talked to a forensic interviewer; correct?
A. Yes.
Q. And about a month after that, did you meet with a Detective Hamrick from Owasso?
A. Yes.

Q. Okay. The person that you did the forensic interview with, are they in the courtroom today?
A. I don't think so.
Q. Okay. You also met with the prosecution team December 18th of 2024; right? About a month ago?
A. Yes.
Q. So you met with Officer Malone on the 24th, and then you had a forensic interview, and then April of 2023 you met with Penny Hamrick, and then last December you met with the prosecution team; right?
A. Yes.
Q. Did you meet with any other law enforcement officers about this case?
A. No.
Q. Now, you said the first time this happened was at the cabin in Marval; right?
A. Yes.
Q. How big was the cabin?
A. It was a pretty decent size.
Q. Okay. Well, so, there was a -- the living room and the kitchen area was one room of the cabin; right?
A. Yes.
Q. You walked through a screened-in porch, and then there was a living room, and it was large enough to have a single futon couch; correct?

A. Yes.
Q. Was there a second couch in there?
A. No.
Q. Was there like a recliner chair, anything like that in there?
A. No.
Q. What other seating was there in that room?
A. It was just the couch.
Q. Just the couch. Okay. So, in the couch -- or in the living room is the couch, and then when you walk through the living room, there was a bathroom, and you could go into the single bedroom that was in the cabin; right?
A. Yes.
Q. And Jordan and Julie would stay in the bedroom; right?
A. Yes.
Q. And there's also a sleeping loft that was above the bedroom; right?
A. Yes.
Q. And that's where the boys would sleep; right?
A. Yeah.
Q. And the couch was like your bed when you went on these trips; right?
A. Yes.
Q. So when you were watching a movie in the summer of 2020, it was you, Jordan, A.A., E.A., Julie, and the four

boys watching the movie; right?
A. No.
Q. Who was not there?
A. The boys were asleep.
Q. The boys were asleep?
A. Yes.
Q. Okay. Was this late at night?
A. Yes.
Q. Okay. So there were -- there was another adult and two other people, all -- and the girls, A.A. and E.A., were on the couch with you and Jordan; right?
A. Julie brought in a chair from outside and sat on that.
Q. Okay. Julie was in a chair, A.A. and E.A. were on the couch; right?
A. Yes.
Q. And none of those people saw this happen, right?
A. No.
Q. Now, the bathroom in the cabin, you could enter from the living room and then go through and also get into the bedroom; right?
A. Yes.
Q. And that was Julie and Jordan's bedroom; right?
A. Yes.
Q. And, on occasion, you would go into the bathroom and sneak into Julie and Jordan's bedroom and spray Jordan's

cologne on your shirt; right?
A. No.
Q. Did E.A. -- I'm sorry, did Julie ever catch you doing this and tell you to stop?
A. No.
Q. Now, the pool at Marval, it's a public pool with -- anybody that's staying there can swim; right?
A. Yes.
Q. Is that a busy resort in the summer?
A. Yeah.
Q. And the first summer is 2020, so that's COVID summer; right?
A. Yes.
Q. Probably a lot of people camping because you couldn't do anything else. Is that how you remember it?
A. Yeah.
Q. And a lot of kids; right?
A. Yes.
Q. Was the pool a popular place when you guys would go? A lot of people there?
A. Yeah.
Q. And that would include Jordan and Julie and their kids; right?
A. Yes.
Q. Did A.A. and E.A. go to the pool with you guys too?

A. Yes.
Q. Did Jordan -- he was throwing you; correct?
A. Yes.
Q. Was he throwing the other kids too?
A. Yes.
Q. And it was out in the open; right? I mean, there wasn't a hidden place that he was throwing you; correct?
A. Uh-huh. Yes.
Q. And nobody else saw what you described as his hand slipping into your swimsuit bottoms; right?
A. No.
Q. Any time you were at the Toyne's house in either Broken Arrow or in McAlester, the kids were there too, weren't they?
A. Yes.
Q. Were you aware that there was a camera in their living room?
A. Yes.
Q. And there's also a camera in their kitchen; right?
A. Yes.
Q. So anything that would have happened in the living room was caught on camera or would have been; right?
A. I believe they didn't get the camera until a few years after they moved into the McAlester house.
Q. Okay. Do you -- when the camera was there, if

something happened in the living room, it would have been caught on the camera; right?

A. Yes.

Q. And if you know, was this a camera that had an app attached to it that would have been -- you would be able to view it from a phone?

A. Yes.

Q. And that would be Julie's phone or Jordan's phone or both, if you know?

A. Both, yeah.

Q. You and Jordan and the kids would play Pokemon; right?

A. Sometimes, yes.

Q. What is that?

A. It's a game.

Q. A game?

A. Yes.

Q. Okay. I'm way older than you, and I've never played this game. Is it something that's on your phone?

A. Yes.

Q. And are there Pokemon throughout the world, and you try to catch them? Is that right?

A. Yes.

Q. Do they tend to be in public places, like a park?

A. Yes.

Q. Would you guys, when you were driving, pull into a

park and try to catch Pokemon while you were driving through it? Do you remember that happening?
A. Sometimes.
Q. Okay. Now, the communications between you and Jordan, he mainly sent you messages, and you sent him messages on Facebook Messenger; right?
A. Yes.
Q. And those messages were totally appropriate, weren't they?
A. Yes.
Q. I think -- you're a Harry Potter fan; right?
A. Yes.
Q. And I think he called you Hufflepuff in a lot of the messages. Is that -- do you remember that?
A. Yes.
Q. And he's a fan of Star Wars; right?
A. Yes.
Q. So there would be memes that had Star Wars characters in it; right?
A. Yeah.
Q. And would he offer to support you when you were upset about something?
A. Yes.
Q. Family stuff, like normal, I'm not getting along with my parents, and you might confide in Jordan. Is that right?

A. Yes.
Q. And that happened during the same time frame, didn't it?
A. Yes.
Q. Now, you guys didn't ever really talk on the phone, did you?
A. We did occasionally.
Q. Okay. Was it rare?
A. Yes.
Q. It was mainly messages on Facebook Messenger; right?
A. Yes.
Q. And you turned your phone over to law enforcement after you made this disclosure in March of '23; right?
A. Yes.
Q. And they searched your phone; right?
A. Yes.
Q. And they didn't find anything appropriate -- inappropriate between you and Jordan; right?

MS. PALADINO: Objection, Your Honor, as asked and answered.

THE COURT: Overruled.

A. I'm not aware of that.
Q. (By Mr. Wright) Okay. And there wouldn't have been any text messages between the two of you; right?
A. No.

Q. Now, did you ever give your phone to Jordan where he could have deleted stuff and hidden things and changed messages?
A. No.
Q. Okay. You kept your phone to yourself; right?
A. Yes.
Q. Were you on your phone a lot?
A. Yes.
Q. Typical teenager living in your phone; right?
A. Yes.
Q. You described an ice storm -- an event where you were going with Jordan to drop his kids off, or at least the three oldest boys, with their mom, Carol; right?
A. Yes.
Q. And where did you guys meet Carol?
A. It was like a Love's near, like, Catoosa.
Q. Okay. And where did your family live?
A. Owasso.
Q. Okay. Was he driving you home too?
A. Yes.
Q. Okay. So he dropped the kids off with Carol at a Love's in Catoosa; right?
A. Yes.
Q. And then you guys drove through a park; right?
A. Yes.

Q. This was in the Chevy Traverse; right?
A. Yes.
Q. Jordan was driving; right?
A. Yes.
Q. Now, the three boys, this would be A.T., R.T., and S.T.; right?
A. Yes.
Q. They were small enough or still so small that they had, like, booster seats or car seats; right?
A. Yes.
Q. And they were riding in the middle seat, and that's where all the car seats were; right?
A. No. There was one car seat, and then, I believe, the two oldest boys sat in the back.
Q. Okay. Where did you sit?
A. I was in the front seat.
Q. You were in the front seat. You weren't riding in the back?
A. No.
Q. Okay. And you guys drove through some kind of park in the Catoosa area. Do you remember where the park was?
A. I don't.
Q. Okay. Did you guys catch Pokemon while you were driving through?
A. No.

Q. That's something you guys did; right?
A. Yeah.
Q. And after you pulled through the park, you went home; right?
A. Yes.
Q. And you said you got in the back seat?
A. Yes. He told me to get in the back seat.
Q. The very back or the middle?
A. The middle.
Q. Okay. And you say you -- did you take your clothes off?
A. Yes.
Q. Okay. Completely?
A. I don't think so, no.
Q. Okay. Would it be fair to say that you took off your pants and your underwear?
A. Yes.
Q. Okay. When -- you understood Jordan was an OSBI agent; right?
A. Yes.
Q. When you made these allegations against him, you didn't ever think it would go farther than you just telling your parents, did you?
A. Not really, no.
Q. You really never thought anything was going to happen

to Jordan; right?
A. I knew something could, but, no, I didn't really think anything would happen.
Q. You felt like there was really -- you could tell this story and Jordan wouldn't get in trouble and maybe you would get out of trouble; right?
A. No.
Q. At this point in time, though, you were getting in trouble and you were having a panic attack from the trouble you were getting into; right?
A. Yes.
MR. WRIGHT: Your Honor, may I have a moment?
THE COURT: You may.
MR. WRIGHT: I'll pass the witness, Your Honor.

REDIRECT EXAMINATION

BY MS. PALADINO:
Q. A.S., this defense attorney just stood up here and implied that you're making all of this up because you got in trouble at school and you were getting in trouble at home. Did you make any of this up because of anything that happened in your house that night?
A. No.
Q. Did you say this because it happened?
A. Yes.
Q. Did you get any benefit from your family after your

disclosure on that night?
A. No.
Q. Was everyone devastated and upset?
A. Yes.
Q. Did it go from being a normal home to a really, really sad and upset home?
A. Yes.
Q. Defendant -- or defense counsel asked you several questions about Julie's work schedule, the defendant's work schedule. Do you remember those questions?
A. Yes.
Q. Was there time between Julie leaving early, early in the morning and when the defendant would leave?
A. Yes.
Q. And during that time when it was just you and the defendant and the kids were in their rooms, would he sexually abuse you?
A. Yes.
Q. Defendant asked you about meeting with multiple people. Do you remember those questions?
A. Yes.
Q. And he asked you if you met with Penny on April 26th of 2023rd [sic]. Do you remember him asking you about that?
A. Yes.

Q. Was that meeting about a ten-minute meeting for you to verify the address the defendant lived at?
A. Yes.
Q. And then he asked you questions about meeting with the government on December 18th. Do you remember that question?
A. Yes.
Q. Did anybody ever tell you what to say?
A. No.
Q. What were you told was the most important thing?
A. That I tell the truth.
Q. Have you told the truth today?
A. Yes.
Q. Defense asked you about sneaking into Jordan's room and spraying his cologne. Did that ever happen?
A. No.
Q. Did Julie ever catch you doing that?
A. No.
Q. Defense counsel asked you questions about cameras in the house. You said you thought it was probably a year or two after they moved there. Do you remember those questions?
A. Yes.
Q. If the defendant was telling you constantly that your disclosure would ruin his job, family, and life, he wouldn't touch you on camera; right?

A. Yes.
Q. Defense counsel asked you a number of questions about talking on the phone versus messaging with the defendant and that nothing was inappropriate. Do you remember that?
A. Yes.
Q. What was on your phone that the defendant knew about that tracked your messages?
A. I had a parent app on my phone.
Q. Okay. What is a parent app?
A. It kept track of everything that I had downloaded and, like, all the texts that were sent and received.
Q. And so what would happen if sex, drugs, or alcohol got talked about on your phone?
A. My parents would be notified that that was happening.
Q. And the defendant knew that you had that software on your phone, didn't he?
A. Yes.
Q. Defense asked you questions about being in the Traverse and where the car seats were. Did the one car seat in the middle where the defendant asked you to get affect his ability to get back there with you?
A. No.
Q. Defense counsel asked you questions about going through that park to find Pokemon. Do you remember that?
A. Yes.

Q. Did the defendant take you through that park to go find Pokemon?
A. No.
Q. Did he take you through that park to try to have sex with you?
A. Yes.
Q. And why was -- why was he needing to do that away from the house at the time?
A. Because Julie did not have a job.
Q. Was she home more often?
A. Yes.
Q. Defense asked you, you didn't think Jordan would get in any trouble. You would just say this, get yourself out of trouble. The defendant would never get in trouble. Do you remember him asking you about that?
A. Yes.
Q. Do you have any legal training as a 16-year-old child at the time?
A. No.
Q. And, in fact, did this defendant tell you exactly what would happen, that it would ruin his life, career, and family?
A. Yes.
Q. Is that what took you so long to tell?
A. Yes.

MS. PALADINO: Nothing further, Your Honor.

Q. (By Ms. Paladino) Thank you, A.S. I have no further questions.

MR. WRIGHT: No further questions, Your Honor.

THE COURT: All right. Thank you. Ma'am, you can step down. Ms. Paladino, is this a good time for a break?

MS. PALADINO: Yes, Your Honor.

THE COURT: Okay. Ladies and gentlemen, we're going to take our midafternoon break. We'll break for 20 minutes, come back at five after three. Please remember my usual instructions. Don't talk about the case. Don't do any investigation about the case on your own, and keep an open mind until you've heard all the evidence. Okay? You can exit through the front door here.

(The following was held outside the presence of the jury:)

THE COURT: The record should reflect the jury is out of the courtroom. The door is closed.

Your next witness will be the 413?

MS. PALADINO: That's correct, Your Honor.

THE COURT: Okay. Mr. Wright, you did not file a response to the government's brief regarding Exhibit 2. Are you objecting?

MR. WRIGHT: I'm not.

THE COURT: You're not objecting?

MR. WRIGHT: I'm not objecting.

THE COURT: Okay. All right. That saves me having to decide. Thank you.

Okay. Anything right now, Ms. Paladino?

MS. PALADINO: Not from the government, Your Honor.

THE COURT: Mr. Wright?

MR. WRIGHT: No, Your Honor.

THE COURT: Okay.

(Recess taken.)

(The following was held within the presence of the jury:)

THE COURT: We are back on the record. All counsel are present. Mr. Toyne is present. The jury is in the box. And the next witness.

MS. PALADINO: The United States calls E.A.

E.A.,

having first been duly sworn, was called as a witness and testified as follows:

DIRECT EXAMINATION

BY MS. PALADINO:

Q. Would you please state your name?

A. E.A.

Q. And would you spell that, please?

A. ********* *************.

Q. Okay. And what is your date of birth?
A. *********, 2006.
Q. How old are you as you sit here today?
A. Nineteen.
Q. Where did you graduate from high school?
A. Southmoore High School.
Q. And what are you doing post-grad?
A. I'm working at First Baptist Moore as a substitute teacher for an age group between infants and four-year-olds.
Q. And did you say that's First Baptist in Moore?
A. Yes, ma'am.
Q. Is that a church?
A. Yes, ma'am.
Q. And what are your plans long-term, career-wise?
A. I plan to go back to school for cosmetology to get my license so I can work in a salon.
Q. So what do you like to do for fun then?
A. I love doing nails, hair, makeup, anything that has to do with the beautification.
Q. And where do you currently live?
A. I live in ************************, Moore, Oklahoma.
Q. And is that with your mom and dad?
A. Yes, ma'am.
Q. Do you have siblings?
A. Yes.

Q. How many siblings?
A. I have four siblings.
Q. What are their names and ages?
A. A.A., she's 16. M.A., she's 23. Ryan is 26. Julie is 30.
Q. So is Julie your oldest sibling?
A. Yes, ma'am.
Q. Who is Julie married to?
A. Jordan Toyne.
Q. And is he the defendant in this case?
A. Yes, ma'am.
Q. So you know him as your brother-in-law?
A. Yes, ma'am.
Q. How old were you when you first met the defendant?
A. Twelve years old.
Q. How old would that have made Julie, if you remember?
A. Twenty-four.
Q. Sorry, I didn't mean to cut you off.
A. That's okay.
Q. Did you say 24?
A. Yes, ma'am.
Q. Did they date for a while?
A. To my knowledge.
Q. And then eventually, did they get married?
A. Yes.

Q. Okay. I want to go back in time just a bit to February of 2021. That was almost four years ago.
A. Uh-huh.
Q. Did you make a journal entry about something that happened to you?
A. Yes, ma'am.
Q. Who was the subject of that journal entry?
A. Jordan Toyne.
Q. And where did the incident take place?
A. In their house in McAlester.
Q. And had you just turned 15?
A. Yes, ma'am.
Q. So at the time, to the best of your knowledge, in the moment that you wrote that journal entry -- let me start that over. Did you make a journal entry close in time to the incident after it occurred?
A. Yes, ma'am.
Q. And so was it your best recollection at that time of what had happened?
A. Yes.
Q. And your impression of the event?
A. Yes, ma'am.
MS. PALADINO: Your Honor, the government would move to offer Exhibit 2 into evidence at this time.
MR. WRIGHT: No objection.

THE COURT: Government's 2 will be admitted.

Q. (By Ms. Paladino) Okay. There should be a binder. It should be Tab 2, yes, ma'am.

MS. PALADINO: And if we could publish Government's Exhibit 2, please. Can we zoom in on the diagram? Yeah, the diagram in the top right corner. Sorry.

Q. (By Ms. Paladino) Okay. So tell us about the McAlester house. How was that laid out?

A. So as you went through the front door, your -- the living room was on the right side, and they had this chimney with a fireplace. As you went down a little further more, on the left, your first left, you could turn with all of the bedrooms. The first bedroom you hit was Jordan and Julie's. The second bedroom that was across from the bathroom on the right side, it belonged to J.J.T. and S.T. And the very back back room was A.T. and R.T's. And if you didn't travel down the hall and you kept going straight, there was a playroom. It had double doors. It was see-through. And then as you walked down, there was a kitchen on your right. It had a bar, and then it was a dining area. On your left was the back door, and on your right was the garage door.

Q. (By Ms. Paladino) And is this drawing that was in your journal entry from 2015, is this how you remember the living room being set up?

A. Yes, ma'am.

Q. So describe just the living room for us.
A. The living room, it was pretty spacious. I mean, they had an L-shaped couch with that little end on the part, but it was separated, and it had that table in between them. And then it had that fireplace, and the TV was on the back. And they had their Christmas tree up still, so ...
Q. And so --
MS. PALADINO: You can take that down. Thank you.
Q. (By Ms. Paladino) So I know that four years ago was a long time ago.
A. Yes, ma'am.
Q. So if -- what would control your memory on what date that -- what would be close in time to the date of the incident?
A. This journal. This is the closest I could get it. I'm not sure if this was the exact date that I wrote it down or days after, but this -- this is as close as I got it --
Q. Okay.
A. -- to what happened.
Q. So what is the date on this journal entry?
A. It says February 5th of 2021.
Q. Had you turned 15 in January right before that?
A. Yes, ma'am.
Q. Where did you usually sleep when you would stay over?
A. I slept on the couch.

Q. And tell me about the incident that happened between you and the defendant in his home in 2021.
A. Well, I just remember that it was about the evening time. And he had brought it up to me earlier on in the day that he had bought a bottle of vodka because we had had a conversation, I want to say a year prior, about it. But he had bought this bottle of vodka and said that me, him, and my sister were going to drink. I had a hard time believing that because my sister wasn't really a drinker. But I just kind of went with the flow and then it carried on.
My sister said she had a headache or some kind and went to her bedroom to go to bed, and he was out in the living room with me. And he was on the opposite side of the couch -- or on the other couch across from me. And I was in the corner sitting, and I was just reading my book. And I think he was going to play a game of some kind. And, eventually, I remember him bringing out a cup of vodka and he sat it down. And I remember my sister coming back in at some point, and I remember him taking the glass of vodka and putting it in the floor. And I was very concerned about that because I didn't know that he was trying to hide it from her. But my sister went back to bed, and I remember we kind of just had a conversation about it. And we were just talking and -- we were just -- we were just talking and it just -- it was just conversation. And then I remember he

brought up a truth or dare game that was for couples. And I thought that it wasn't going to be as weird as it was, but he profusely asked me, do you want to play this game? I didn't want to come off -- I didn't want to be rude, and I didn't want to be disrespectful, and I didn't want to seem like -- like I didn't care. So I just said, okay, you know, I guess we can play it.

And he asked me if I wanted my name to be E.A. or Julie, and I said, just leave it as Julie because I didn't want my name in there at all.

Q. (By Ms. Paladino) Was this an app on his phone?
A. Yes, ma'am.
Q. Okay.
A. And so we started off the game, and I told him I only want to do truths because I had a feeling that it was going to get weirder than how it already was with the truths. So we just were playing truths at one point and --
Q. Were the truths sexual in nature or something else?
A. They were just like in sexual nature, but some of them were different. It just was like 50-50. Some of them would ask questions about, like, maybe like your sexual life or something that you've done that nobody knew about or just, you know, just something random. But I just remember that it was just kind of a constant battle that he really wanted to pick dare. And I just didn't know why. I thought maybe

he thought it would have been funny or something along those lines. But I remember that I was constantly having to press the truth button because I didn't want him -- I didn't want to see what a dare looked like. I just -- I just didn't.
Q. And so -- let me stop you there for just a second.
A. You're all right.
Q. So you said you thought maybe the defendant was trying to be funny. Had he already -- had he made a joke with you about it being funny if you walked in on him and Julie having sex?
A. Yes, ma'am.
Q. What did he say about that?
MR. WRIGHT: Objection. Leading.
THE COURT: Sustained.
Q. (By Ms. Paladino) What did the defendant -- before the truth or dare game, what had the defendant said to you that made you feel uncomfortable?
A. He said that him and Julie were talking while I was laying J.J.T. down, and he told me that he thought it would have been funny if I walked in on them two having sex. And I didn't find that funny at all.
Q. Did that sound like something your sister would have said?
A. No. That sounded really off of the norm. Like -- that just -- that just didn't sound anything like my sister

would even have a conversation about.
Q. Okay. So you said that you were -- you know, he kept trying to press dare and you would try to real quick press truth.
A. Uh-huh.
Q. What happened after that?
A. Could I look at my notes just real fast to refresh my memory?
Q. Would seeing your journal entry help you remember?
A. Yes.
Q. And I think it's -- if you want to look at page two, toward the bottom of page one into page two. I'm sorry. Not page two, page three. And when you're refreshed, look up.
A. (Witness complies.)
Q. Did that help refresh your memory?
A. Yes, ma'am.
Q. Okay. So what happened while you guys were trying to decide who's going to press -- you were trying to press truth, he was trying to press dare. What happened?
A. So I guess it was just like -- I just remember he clicked dare, and it said along the lines of pull a piece of clothing off the other person with your teeth. And I think that's when I kind of just started to panic because I didn't expect anything like that to be said. And then when I told

him that it was really gross and it was really weirding me out, he kept calling me a pussy and was telling me I was just being a big baby about it and was -- I just --
Q. Did you ultimately end up taking either one of your clothes off with each other's mouth?
A. No, ma'am.
Q. Okay.
A. No, ma'am.
Q. And so did he ever dare you to take your pants off?
A. He made a joke about it. I remember him making a joke about, "Well, why don't you just pull your pants down right now?" And I think that's when I was like, I need to leave. I need to go. And I think after that, that's when I just trying to find any reason to get out of the room.
Q. Okay. So after this dare comes about, you feel uncomfortable.
A. Uh-huh.
Q. Did he ever physically touch you, like try to tickle you or something different?
A. Yeah. Well, he was just trying to blow it off, I guess, is what it felt like. He was just trying to push it off like it didn't matter. And so he just started, like, trying to tickle me as, like, a game. And I was not really trying to fight him off, but I was just trying to push him off and just keep him from touching me. And I could just

tell that I didn't feel right with where his hands and his -- I just felt like his intention was bad while he was tickling me. Because I could tell, like, his eyes were looking in places and his hands were reaching for things, and I just -- I didn't know what else to do.
Q. What parts of your body were his hands reaching for?
A. I could tell that my boobs were being reached for and my upper thigh was being reached for. Sometimes my waist around where my stomach was, and I just was really uncomfortable.
Q. Did you end up -- or ever try to grab his hands?
A. He grabbed mine at one point to get me to stop trying to fight him. And I just -- my dad kind of taught me a trick where you just kind of flip your wrists and so you could grab onto theirs, and it was -- we did that for about a second, was just flipping the wrists, just trying to get him to stop grabbing onto me. And so, yeah.
Q. Did he stay on the other couch or did he move?
A. He moved next to me, I want to say during the truth or dare game.
Q. And what happened after the wrists grabbing stuff?
A. I remember I was trying to do something. Can I refresh my -- can I look at this real fast?
Q. Would reviewing the journal entry that you wrote in February of 2021 refresh your memory?

A. Yes, ma'am.
Q. And that binder, you should be able to turn to page 4 and 5 if you need to.
A. Okay.
Q. Please look up when you're refreshed.
A. (Witness complies.)
Q. Does that refresh your memory?
A. Yes, ma'am.
Q. And so what happened after the wrist grabbing stuff occurred?
A. He brought up his trip with Julie to Disney World or Disneyland, one of the two, and then he asked me about a fight they had gotten into. And I kind of remember Julie had talked to me about it, but I don't remember like seeing it, but --
Q. And just to be clear, a fight between him and Julie?
A. Yeah, him and Julie.
Q. Okay. Did he accuse her of something?
A. He said that she was cheating on him. And I just -- my sister is a godly woman, and I know that she was not like that in any way, shape, or form. I know she wasn't.
Q. So what did he do after that? Did he show you anything?
A. He was showing me pictures and videos of them going there. And I just remember thinking that I just felt like

he was just trying to blow it off once again. That like what was happening wasn't really happening.

Q. Did the defendant continue to talk to you about sex?

A. Yeah. We had a conversation, and I remember him asking me, "Does sex bother you?" And I didn't want to seem like I was immature or just -- just immature basically. I just didn't want to feel like I was a little kid. And so I just said, "No, it doesn't, it doesn't bother me." And then he said, "Well, you know, sex is just sex," and I didn't agree with that. And it was just -- it just -- it just made me sick.

Q. Was that in response to -- because I know you said you didn't want to seem immature. So did you discuss some sexual activity on your part with him?

A. Yeah, I -- he asked me how school was going, and I just told him that I just was not having it with this other girl, and the reason was because of, you know, something that had to do with her boyfriend. And that's when he was just like, well, sex is just sex, and I just told him that I don't think so.

Q. At some point did the defendant touch you again?

A. When we -- I remember he was showing me something on his phone, where it was pictures of them, but I remember his hand being on my leg, my upper thigh. And I didn't -- I was scared that if I tried to get up that I was going to get

pushed back down or something was going to happen, so I just didn't really move and kind of froze in fear. And then I remember I tried to get up and go see -- to go lay down with his son, his little baby because I was just scared, and I thought that has to be my safe place, is with, you know, a child, because, you know.

Q. Okay. Let's walk that back just a little bit. So you said he placed his hand on your thigh.

A. Uh-huh.

Q. Was he moving his hand around?

A. It just kind of felt like he was just caressing me, just like petting me almost. And I just -- I couldn't take it anymore.

Q. And was that all around your thigh, your inner thigh, outer thigh?

A. Yeah, it was just like on the top, but he was just kind of tracing my inner thigh and my outer thigh, and I just ...

Q. What was he saying or mentioning to you about the alcohol at that point?

A. He was mad that I didn't want to drink it anymore. Because when he first gave it to me, I didn't drink it. I just put my lips on it because I didn't want to ingest anything. But he got mad that I didn't want to drink it anymore, and I told him that it was gross and I didn't like

it. And then he continued to call me just a pussy and you're such -- you know, just -- just trying to make me feel small.
Q. Okay. You mentioned that you got out of there and went to, I think you said, J.J.T.'s room.
A. J.J.T.'s room.
Q. Was your original plan to sleep on the couch that night?
A. Yes, ma'am.
Q. Why did you go into J.J.T.'s room?
A. Because I -- I was in fear. I was shaking and I didn't know what else to do, but J.J.T. was really important to me.
Q. It's okay. There's a tissue right there. Who did you say was really important to you?
A. J.J.T.
Q. Who is J.J.T.?
A. He is the son of Julie and Jordan.
Q. Is he the youngest kiddo?
A. He's the youngest.
Q. How old was he at this time in 2015?
A. I want to say he was 2 or 3.
Q. Was he in a crib?
A. No, he was on a twin.
Q. Okay.

A. Is where I had him on my chest.
Q. Okay. So you went into the room and picked J.J.T. up?
A. Yes, ma'am.
Q. And then what did you do?
A. I laid him on my chest, and I put my pants above my hip waist and I tied it as tight as I could. And I wrapped us up in all the blankets, and we (indiscernible) till the morning.
Q. What was he saying to you as you were walking back to J.J.T.'s room?
A. He just didn't understand why I wanted to go sleep in his room. He just was telling me, you know, why would you want to go sleep in there? You sleep out here every time. Why are you just being such a pussy about everything? And just -- again, just making me feel small about my decisions.
Q. Did you eventually go to sleep?
A. Yeah.
Q. And so what happened the next morning?
A. After -- I want to say he was gone, and I brought it to Julie's attention. I told her what had happened, and she didn't really believe me at first. But I told her that there was a bottle of vodka in that fridge, and I told her, it's open. It was closed last night, and I know you knew it was closed, and it's open. That's all I can tell you that -- that helps, you know, try to prove what happened -- what

happened, you know. And I just told her, just go look, and she saw it.

And at first, she did believe me until she had a conversation with Jordan about it. And I didn't want to say anything when they were talking about it because I didn't want him to not only go for me, but for my sister. And so I just thought it would be better if I just kept my mouth shut. But he basically just said, Julie, you don't trust me, you don't trust me. I wouldn't do such a thing.

MR. WRIGHT: Objection. Hearsay.

THE COURT: Sustained.

MS. PALADINO: I think it's the defendant's statement, Your Honor.

THE COURT: Sustained.

MS. PALADINO: Okay.

Q. (By Ms. Paladino) After that, did you go back home?
A. Yes.
Q. And did you talk to Julie again about it?
A. I tried not to.
Q. But did she talk to you about it?
A. She did later on in the future.
Q. What did she tell you?
A. She just told me that she had seen camera footage of some kind, and that it didn't happen, and that I hallucinated it all.

Q. Did she offer to show you that video footage?
A. No, ma'am.
Q. Have you ever seen any video footage of that day or night?
A. No, ma'am.
Q. Did you hallucinate?
A. (Shakes head.)
Q. You have to answer, I'm sorry.
A. I'm sorry. No, I didn't.
Q. So did you then tell your mom?
A. Yeah.
Q. And what did she have you do?
A. She had me write it down. And she said, "If it really happened, it will happen again."
Q. And so what did she do -- or what -- what changed about your contact with the defendant and Julie after that?
A. Every contact I ever had with Jordan was gone. Everything that I had, his number, anything, was gone. I only had contact with Julie.
Q. Did how often you were over at the house change?
A. Yes.
Q. How did it change?
A. I wasn't really allowed to sleep over at all. And if I went over there, it had to be -- Julie had to be there. And it was only if my parents allowed me to.

Q. Was that hard for you to accept?
A. Yeah.
Q. How did that make you feel?
A. It hurt my soul.
Q. At that time, had you spent a substantial amount of time over there?
A. Yeah. They were like my escape house from the crazy world that I lived in, you know, and ...
Q. How come the journal entry that you wrote down in February of 2021 leaves out vodka?
A. Because part of me didn't really want my mom to know, because I was scared that I was just going to get in trouble for saying that I was given alcohol. But now that I look back on it, I just wish I would have wrote it down.
Q. At that time that all of this happened, were you scared of the defendant?
A. (Nods head.)
Q. You have to answer, I'm sorry.
A. Yes, ma'am.
Q. Why were you scared of him?
A. I just feel like ever since I met Jordan, it just felt like there was something that just made him feel like he was overpowered. He just felt overpowering all the time. Just felt like --
Q. Was there ever a specific incident that made you feel

like he was overpowering?
A. Yes, ma'am.
Q. Tell us about that.
A. Julie was pregnant and I was 12. And I made a joke to my sister about -- or to him about my sister saying, this is my sister, you can have 10 percent and I can have 90. And he got upset with that, and then put me in handcuffs on the floor in front of her.
Q. And was he being playful?
A. It hurt. I thought he was being playful, but it hurt so I didn't know. I just knew that I didn't want to make it worse.
Q. How did Julie react to that incident?
A. I -- I'm not sure. I just remember her not really saying anything about it, so I thought maybe he was just joking around, just playing.
Q. But did that affect how you saw him as far as strength?
A. Yes, ma'am.
Q. Who is A.S.?
A. I was told it was the daughter of a family friend.
Q. Have you ever met A.S.?
A. Only a few times.
Q. And so was she brought into your life through Julie's side of things or through Jordan's side of things?

A. Jordan.

Q. Okay. When did you first meet her?

A. It was a cookout we were having at the Okmulgee house they had. And it was A.S. and her family, and it was us, and that was about the first time I met her.

Q. Okay. And so did the defendant and your sister live in Okmulgee before they moved to McAlester?

A. Yeah.

Q. What was A.S. like?

A. She was very quiet, very kept to herself. She was very sweet and kind to me. Very polite.

Q. You said that you saw her just a few times, so did you guys occasionally overlap at your sister's house?

A. Yeah.

Q. But not every time?

A. Not every time, no.

Q. Can you remember a time that you tried on some of Julie's clothes?

A. Yes. There was a bag of clothes that Julie had gone through, and she told me that she wanted me to go through it. I remember that -- I want to say Jordan mentioned it, but I just remember me and A.S., we went into the closet and we tried on the clothes. And I don't think my sister was very happy about it because I think she just wanted me to have them, but I just kind of left it at that.

Q. Okay. So was there any discussion of you and A.S. on your own trying on Julie's clothes or was it suggested to you?
A. I can't remember.
Q. Okay. Did you talk to A.S. about the defendant or anything that had happened to you?
A. Nothing that had happened to me, I just told her that I was uncomfortable with him.
Q. Did A.S. tell you anything that had happened to her?
A. No.
Q. Did you go on a trip to Marval when you were around 13 with A.S.?
A. Yes, ma'am.
Q. Who did she stay with?
A. Jordan and Julie.
Q. And where did you stay?
A. I was in a cabin with my mom.
Q. And since you guys were close in age, would you kids kind of get together at each other's cabins and stuff?
A. Yeah.
Q. Okay.

THE COURT: Okay. Ma'am, I'm sorry, you're going to have to speak up. Okay?

THE WITNESS: Yes, ma'am.

THE COURT: Thank you.

Q. (By Ms. Paladino) Was that a yes?
A. Yes, ma'am.
Q. Okay. Did you ever meet Stephanie?
A. Only a few times.
Q. And was that whenever you were alone with Julie and the defendant or was this later?
A. It was later on.
Q. Okay. Who was Stephanie or what did you know her to be? Who did you know her to be?
A. She was my sister's best friend.
Q. Okay. So 2021, this incident happens, your contact gets cut off. At some point did your family just move forward and move on from the incident?
A. We had to because I wanted them to. Julie meant everything to me, and I didn't want her to feel excluded.
Q. Okay. And so you said you didn't want her to feel excluded. So tell me what you mean by that. What was Julie doing to keep her from feeling excluded?
A. Well, she lived far away already. I just -- she really did just mean everything to me, and I knew that it was important for her to be there at events like Christmas, Thanksgiving, and I didn't want to exclude her and her family, so I wanted to make sure that if Julie came, she could bring who she needed to.
Q. Okay. So then did you see the defendant at some

holidays after the incident?
A. Yes, ma'am.
Q. Were you ever alone with him, though? If you're -- like, was it in a group of people?
A. It was always in a group of people. We only had one conversation in 2023. It's probably the first time we talked since, and he just wanted to tell me about how Julie wrecked his car, and Julie did this and Julie did that.
Q. Did you immediately get away from him at that time?
A. Yes, ma'am.
Q. So you mentioned 2023, and I want to talk about 2023. At some point did this incident all get brought back up for you?
A. Yes, ma'am.
Q. Did you have to go give a forensic interview all these years later?
A. Yes, ma'am.
Q. Were you prepared to have to talk about this all these years later?
A. No, ma'am.
Q. What did you understand had happened that made you have to go get a forensic interview in 2023?
A. I was just told that there was an incident between Jordan and somebody, and that was about it.
Q. So you didn't know who or what it was or anything like

that?
A. No.
Q. So this interview gets kind of sprung on you for the first time four years later. Have you had a hard time remembering everything?
A. Yeah, I really did. I buried a lot of it, so I wouldn't have to think about it again.
Q. How did you feel about the fact that the defendant had done this to you?
A. I just couldn't believe it because everybody in my family didn't like him to begin with. And I wanted to give him a chance because my sister was important to me. So I thought if I give him a chance, you know, maybe they'll change their minds. And I just feel like that chance was taken advantage of.
Q. After you give your forensic interview, did this -- you know, obviously, you were 15 when it happened, and then years later you're 17, so you're a couple years older.
A. Yes, ma'am.
Q. Were you able to reflect with the benefit of hindsight after the forensic interview?
A. Yes, ma'am.
Q. And what stood out to you that was odd about the defendant prior to that night?
A. There were just memories that I couldn't forget that

just really made me feel like there was something going on all along, and I just didn't realize it.

Q. What stands out to you as odd about the defendant's behavior?

A. He just --

Q. Or can you give us an example of something that stood out to you?

A. There was a time where we went on a boat trip, and it was at his parents' house. And we went on a boat, and we were out on the lake. And I remember he was throwing Julie in by the waist, and I just remember thinking, okay, well, this is fun, you know. And then he asked if I wanted to be thrown in, and my dad had done that, so I didn't think anything of it. But he just kind of, like, was throwing me in by my butt and my waist, like a basketball almost, and I just --

Q. Where was his thumb placement?

A. Really close to where my areas are.

Q. When you say area, are you talking about a vagina --

A. Yes, ma'am.

Q. -- a butt, something else?

A. Yes, ma'am.

Q. What are you talking about?

A. Probably my vagina and my butt, mostly.

Q. Okay. I know this is really hard to talk about, but

when you say "probably" --
A. Yes.
Q. Was it your vagina?
A. Yes.
Q. And how would he throw you?
A. Just literally, like -- like a basketball like that. Like, his thumb up underneath me, and his hands on my butt, and he'd throw me in like that.
Q. Okay. And when you -- you said you were at the defendant's parents' house. Do you remember how old you were when that happened?
A. I just remember -- I want to say it was the year they got engaged.
Q. Okay. Were you -- you were younger than 15?
A. Yes.
Q. On that same boating incident, what happened to your legs?
A. My leg got caught in the router [sic]. It wasn't on, but my leg got caught in the router, and I was really bruised up pretty bad. And I remember we were at the house in Okmulgee, and my sister gave us some Icy Hot to put on it. And I had never used Icy Hot before, I didn't know how it worked. But I remember Jordan offering to help me put it on, and before he put it on my legs, he asked me if he wanted to kiss my bruises. And Julie had told me ever since

day one that he's just trying to be a father figure to you. And so I didn't think nothing of it, so I didn't want to be rude, so I just said okay. And then I just was so disgusted.

Q. So did he kiss your bruises?

A. Yes, ma'am.

Q. And where were your bruises located on your body?

A. On my upper thigh, between my knee and my hip.

Q. Okay. And I know you say you were disgusted reflecting on this in hindsight at 17 to 19 when this all got brought back up, but, at the time, did you really understand what was going on?

A. I had no idea. It felt like a constant battle in my brain. He's good, he's bad, he's good, he's bad. I didn't know. I didn't know what to think.

Q. And so did you tell anyone about that?

A. Not until after. I think I told my mom, brought it up to her maybe years later.

Q. Okay. Was there ever an inappropriate or something that stood out to you as odd interaction with the defendant at Marval, the campsite?

A. That was when A.S. was there as well. He had a bottle, I want to say of whiskey or something on the counter. And that's when our conversation happened about the vodka because he had asked me, like, do you prefer -- do

you like -- do you drink? And I just was like, I've only had vodka. That's all I've had. And he brought up the truth or dare game. The first time was in that moment, but it wasn't anything like it was the second time. He just kind of made it seem like this is what me and Julie play and then just kind of moved on.

Q. So you guys didn't get into any dares or anything like that?

A. No, we didn't.

Q. He just introduced the concept?

A. Yeah.

Q. Where was A.S. when that was happening?

A. I want to say she was with Julie in the car on the way to the store.

Q. And why had A.S. gone with E.A.? I'm sorry. Why had A.S. gone with Julie?

A. Because I think A.S. was trying to go with Jordan and Julie wasn't comfortable with that, so she took A.S. instead and told me to stay.

Q. So who all was in the cabin when this happened?

A. I want to say the kids were in there too with me and Jordan, but I -- I can't remember.

Q. Okay. Would they have been hearing you guys talk about alcohol or playing somewhere else?

A. I think they would have been between the screen

because it had a screen outside the front door, but I can't remember.
Q. E.A., do you see the defendant in the courtroom today?
A. Yes, ma'am.
Q. Can you please point to him and identify an article of clothing?
A. Jordan Toyne.
Q. And can you describe something he's wearing?
A. Just a suit with a striped tie.
MS. PALADINO: Your Honor, if the record could reflect that he's been identified.
THE COURT: I'm sorry?
MS. PALADINO: If the record could please reflect that he's been identified.
THE COURT: Yes.
MS. PALADINO: Thank you, Your Honor.
And may I have just one moment?
THE COURT: Yes.
Q. (By Ms. Paladino) E.A., has this -- the incident leading to the change in relationship with the defendant and your sister changed your life in a negative way?
A. Yes, ma'am.
Q. What was it like having to cut Julie so significantly from your life?
A. It was really hard. It was really hard.

Q. Okay. E.A., thank you. I don't have any further questions for you right now. I'm going to sit down. Defense counsel is going to talk to you and I'll get back up. Okay?

CROSS-EXAMINATION

BY MR. WRIGHT:

Q. No one in your family likes Jordan; right?

A. Yes.

Q. And Julie, she's 10, 12 years older than you; right?

A. Yes, sir.

Q. So she was like a mother figure also, wasn't she?

A. Yes, sir.

Q. And if you were having problems with your mom, Julie was somebody that you could go to; right?

A. Yes, ma'am [sic].

Q. You even -- before Jordan and Julie got together, you wanted to live with Julie; right?

A. To a certain extent, sir.

Q. And when Jordan came in the picture, it interfered with that; right?

A. Yes, sir.

Q. Now, we talked about this Exhibit 2. And you said that you told your mom about this happening, and she had you write this down; right?

A. (Nods head.)

Q. Is that a yes?
A. Yes, sir.
Q. Thank you. And is this what you wrote down?
A. Yes, sir.
Q. And the date on it, February 5th, is that the date you wrote it down?
A. I'm not sure, but if it -- it's either the day of or a couple days within that same range.
Q. Okay. And you mentioned that you had also just turned 15; right?
A. Yes, sir.
Q. And your birthday is *********** of 2006?
A. Yes, sir.
Q. Okay. Now, I think you also said in an interview that the Christmas tree was still up at Julie's house when this happened. Do you remember that?
A. Yes, sir.
Q. Now, you turned 15, ***********, and the Christmas tree was still up. So did you wait a couple weeks before you told your mom about this?
A. No, sir.
Q. Okay. Did you -- do you remember this being while you were on Christmas break? Why were -- why were you at Jordan and Julie's?
A. It's just -- I want to say it was just a weekend that

I just so happened to be able to go down, and my mom said that she was fine with it.

Q. Okay. So you went down for the weekend, and then you came home, and you told your mom immediately?

A. Not immediately. It had been at least two or three days, and then I just couldn't hold on to it anymore, so I told my mom.

Q. And you wrote this down; right?

A. Yes, sir.

Q. But you left some stuff out of this. Fair?

A. Yes.

Q. So this is not a completely accurate statement; right?

A. Not a hundred.

Q. As you were testifying, you said, especially about the Marval trip, I think and I can't remember quite a few times. Do you remember that?

A. Yes, sir.

Q. Do you have a strong memory of that at Marval or is it more foggy?

A. The trip itself was foggy, but my memory is very clear in the scenarios that I spoke of.

Q. Okay. Do you remember -- and I think you were asked about this in an interview -- anything happening between Jordan and A.S. on that trip?

A. Not that I remember.

Q. Okay. Do you remember watching a movie with Jordan and A.S. and your sister and Julie?
A. Yeah.
Q. Do you remember anything strange happening then?
A. No, sir.
Q. Okay. Now, you had to refer back to this a number of times during your testimony; right?
A. Yes, sir.
Q. And you didn't have a strong memory, it seemed like, of this event either. Is that fair?
A. Yes. It's been five years, sir.
Q. Sure. Is there anything else that would cause your memory to not be good?
A. No.
Q. Do you take any medications that would affect your memory?
A. Not that it would affect my memory.
Q. Okay. You -- did you take medication back in 2021?
A. 2021?
Q. Yes.
A. I think I was only on a sleeping medication and one that helped with my depression and anxiety, but it was more hormonal than it was anything else.
Q. Okay. And as I understand it, that you were in the Plaza Towers when the tornado came through Moore; right?

A. Yes, sir.
Q. And that was back in 2013?
A. Yes, sir.
Q. Did you take medication because of that event?
A. I started taking medication because of that event, yes, but I -- I had struggled with a lot of anxiety and depression, but that was the main cause of it.
Q. Okay. So you would have been on that medication eight years later in 2021?
A. No. I didn't start medication until I was in the eighth grade.
Q. Okay.
A. Which was 2020.
Q. Okay. So in 2021 --
A. Uh-huh.
Q. -- when this note is written, you were taking medication; right?
A. I just want to say sleeping medication.
Q. Okay. Now, you told Julie about this; right?
A. Yes, sir.
Q. Did you tell her while you were still in McAlester or when she was driving you home?
A. In McAlester, on her couch.
Q. Okay. And she has a camera in her living room; right?
A. Yes, sir.

Q. And the camera would have caught this; right?
A. She said there was one. She said that it caught it. I had no knowledge of a camera. That -- only camera I knew about was the one in the kitchen that was unplugged.
Q. Okay. But she told you that she saw this event on camera and what you described didn't happen; right?
A. Yes.
Q. And did she ask you to apologize to Jordan?
A. She did, but I can't remember if I did or not.
Q. When you were out at the lake on Jordan's family's boat, there were a number of people on the boat; right?
A. I just remember it being me, Julie, Jordan, and I want to say some of the kids were on that boat too.
Q. Okay. Was Anna there?
A. I don't remember if Anna was there.
Q. When you say some of the kids, do you mean A.T., J.J.T., S.T., R.T?
A. Yes, sir.
Q. Okay. And he was throwing you in off the boat in front of people; right?
A. Uh-huh.
Q. Is that a yes?
A. Yes, sir.
Q. Okay. Did anybody else see this?
A. I didn't talk about it with anybody else. I don't

know if anybody else saw it.
Q. The truth or dare game was an app that was on his phone; right?
A. Yes, sir.
Q. Did you normally keep a journal?
A. I did for therapeutic help, but I never really kept one on me like that.
Q. You mentioned that Julie was important to you and going to Jordan and Julie's was important to you because it was your escape house from the crazy world you live in. Do you remember saying that?
A. Yes, sir.
Q. What does that mean?
A. I lived in a household of four siblings, two dogs, and it was always hectic. I was the emotional one of the group because of what had happened to me in 2013, so it was hard for me to -- to -- it was just hard for me to get along with my siblings without feeling like they were attacking me for my emotional side.
Q. A lot of the events that you've described, you didn't really think about or remember or think they were significant until way later; right?
A. I always felt weird about them. That's why I was able to remember those spots in time, but yes.
Q. But it's sort of like you -- did you hear about the

allegations with A.S. and then think back and remember these events?
A. I just remember when they had asked me about it. I wasn't told any allegations about A.S. I was told that something had happened. And after I had talked about it with my forensic interview, I had a conversation with my mom, and she had asked me, "E.A., do you remember anything that could have led to this?" And that's when I thought on it, and my memory came rushing back.
Q. And that was prompted by your mom talking to you about this; right?
A. Yeah, she had asked me.
Q. And you and A.S. talked about Jordan some; right?
A. Not really.
Q. Well, you said that -- you said he made you feel --
A. Uncomfortable.
Q. -- uncomfortable. But she didn't say anything to you that he made her feel uncomfortable too; right?
A. No, sir.
Q. And she didn't disclose anything that had happened between her and Jordan; right?
A. No, sir.
Q. Jordan and Julie still come to your house for, like, say, Christmas 2023; right?
A. Yes.

Q. And you told the jury about a time when Jordan was talking to you about Julie being in a car wreck; right?
A. Yes, sir.
Q. Nothing inappropriate about him saying Julie was in a car wreck, was there?
A. No, sir, but all of those feelings I had once before were -- came running back.
Q. The journal entry, when did you find that again?
A. My journal entry?
Q. Yes.
A. I want to say about a couple weeks before the forensic interview. My mom had held onto it after I had wrote it down, and I never saw it again until the forensic interview.
Q. Do you remember writing it down?
A. Yes, sir.
Q. It was roughly two years beforehand?
A. Yes.
Q. Okay. And the date on it is the date you wrote it?
A. I'm not sure.
Q. Okay.
A. It had to be in the span of a couple days or the day of.
Q. If that were of -- you went on a weekend; right?
A. Yeah.
Q. Okay. Would you have written it on a Friday, do you

think?
A. I'm not sure.
Q. Okay.
MR. WRIGHT: May I have a moment, Your Honor?
Q. (By Mr. Wright) Do you have a cousin named Ronnie?
A. Yes, sir.
Q. Do you remember if she was on the boat?
A. She may have been.
Q. Okay.
MR. WRIGHT: Pass the witness, Your Honor.

REDIRECT EXAMINATION

BY MS. PALADINO:
Q. E.A., defense counsel asked you several questions about Julie, your older sister, being like your mom, taking care of you, that you wanted to live with her, that being with her was an escape from all your siblings and dogs. Do you remember those questions?
A. Yes, sir. Or yes, ma'am.
Q. That's okay. Is that why it was so hard for you to disclose this to your mom?
A. Yes, because I didn't want my mom to think that I was trying to replace her because I wasn't. I just needed an escape.
Q. Okay. And if you told your mom what the defendant had done to you, did you think that would change your ability to

go to Julie's house?
A. Yes.
Q. And did you want to quit going to Julie's house?
A. I just wanted my sister. I didn't really want to go to her house, but I just wanted my sister.
Q. So did disclosing this to your mom create a negative impact in your life?
A. Major.
Q. Defense counsel asked you about medications related to memory. Do you remember those questions?
A. Yes, ma'am.
Q. Did your medicine or medications then or now affect your ability to have memory about things?
A. No, ma'am.
Q. Does the fact that this was four and five and six years ago affect your memory?
A. Yes, ma'am.
Q. And defense counsel asked you some questions about Julie catching this on camera and telling you it didn't happen. Do you remember those questions?
A. Yes, ma'am.
Q. Did Julie ever invite you to watch the camera footage?
A. No, ma'am.
Q. To your knowledge, did she ever show that camera footage to anyone in your family?

A. None to my knowledge.
Q. So who has seen the footage?
A. All I knew was that Julie and Jordan had seen it.
Q. Did you make any of this up because you're on medication?
A. No, ma'am.
Q. Did you describe what happened in this courtroom because it's the truth?
A. Yes, ma'am.
Q. How did it make you feel when your sister asked you to apologize to her husband?
A. I was heartbroken.

MS. PALADINO: Nothing further, Your Honor.

RECROSS-EXAMINATION

BY MR. WRIGHT:

Q. All you wanted was your sister; right?
A. Yes, sir.
Q. And Jordan came between that, didn't he?
A. He was never in between it. He was on the outskirts of it.
Q. Well, he prevented you -- when he came into her life, your plan to move in with him -- or move in with her and maybe get emancipated changed; right?
A. That plan didn't even start until Julie had her own place out with Jordan.

Q. But once Jordan got more involved, would you agree that your ability to move in with them changed?

A. After what had happened to me, I had made the decision that I didn't need to be there. So, yeah, that thought had left my brain.

MR. WRIGHT: Nothing further, Your Honor.

THE COURT: Thank you, ma'am. You can step down.

THE WITNESS: Thank you.

MS. PALADINO: The United States calls Rhonda Audette.

RHONDA AUDETTE,

having first been duly sworn, was called as a witness and testified as follows:

DIRECT EXAMINATION

BY MS. PALADINO:

Q. Would you state your name, please?

A. Rhonda Audette.

Q. And would you spell that?

A. R-H-O-N-D-A A-U-D-E-T-T-E.

Q. And where do you live?

A. Moore, Oklahoma.

Q. And where do you work?

A. Moore Public Schools.

Q. Who all lives in your home?

A. It's me, my husband, Eric; Ryan, M.A., and E.A. and

A.A.
Q. And are those your children?
A. Yes.
Q. So who all are your children and what are their ages?
A. Julie Toyne, she is age 30. Ryan is 26. Mya is 23. E.A. is 18. And A.A. is 16.
Q. And is E.A. your second to youngest child?
A. Yes.
Q. And is Julie your oldest child?
A. Yes.
Q. Who is Julie married to?
A. Jordan Toyne.
Q. Is he the defendant in this case?
A. Yes, ma'am.
Q. When did you first meet this defendant?
A. It was about a year before she got pregnant with J.J.T. Maybe -- I remember it was in the fall.
Q. When was J.J.T. born?
A. J.J.T. was born seven years ago in September.
Q. So do you think you've known the defendant for eight or nine years?
A. I would say at least eight years, almost nine.
Q. Okay. And how old would E.A. have been around eight years ago?
A. She would be 11.

Q. And so she was a lot smaller than she is today?
A. Yes.
Q. And did she start going around and meeting the defendant at that time?
A. I'm sorry, what?
Q. Did she start meeting and being around the defendant at that time?
A. Yes, she was. She was there often.
Q. And what was E.A.'s relationship like with her sister, Julie?
A. Very good. Her sister and her are very, very close. They've always been close, and she took care of her a lot as she was little, and she just took her on like she was her own kid.
Q. Did you all do things together as a family, like you and your husband and the kids that were still at home, and then also Julie and her husband, Jordan?
A. Yes. We took a couple of vacations. Once we went to Gore, and it's like a little camping resort.
Q. And how would it work? Would you guys all be in one cabin? Would you get multiple cabins or something else?
A. We would each rent a cabin. Each family that was in the family group, we'd rent individual cabins.
Q. Did an incident between the defendant and E.A. occur when E.A. had just turned 15?

A. Yes.
Q. How are you able to remember that she was 15?
A. She kept a journal, and she wrote in her journal about the incident.
Q. And was that incident dated with the year?
A. Yes, it was.
Q. And so if it was 2021, is that how you know she's 15?
A. Yes.
Q. Did you have her write that journal entry?
A. Yes, I did.
Q. And was it close in time to the incident?
A. Yes, it was.
Q. What was E.A.'s demeanor like when she described to you what happened?
A. She was really upset, crying, just beside herself.
Q. And what did she tell you happened?
A. She told me that the evening that she was with Julie to stay over the night, that Julie had went to sleep, and that Jordan and her were in the living room sitting on the couch.
MR. WRIGHT: Objection. Hearsay.
MS. PALADINO: Excited utterance, Your Honor. She was crying.
THE COURT: I'm sorry?
MS. PALADINO: Excited utterance. She was crying

and distraught when she described this to her mom.

THE COURT: Overruled.

Q. (By Ms. Paladino) You can continue.

A. She said -- she said that she was sitting near him, and that he was showing her -- well, it started with a conversation about things he didn't like about Julie. And then he started showing her things on his phone that was inappropriate in nature, in a sexual-like nature.

Q. Did she say it was a game?

A. It was a game. She said it was a truth and dare game on her -- on his phone. And then one of the questions or dares was to pull her pants down, and she got very scared, and she left the room.

Q. So did E.A. tell you that she was scared?

A. Yes, she did, and she was really distraught.

Q. What was your understanding of what Julie knew about the incident?

A. She had talked to Julie about it.

Q. And what did Julie tell her?

A. Julie said she viewed the cameras and that nothing had happened.

Q. And did you reach out to Julie about this?

A. Absolutely. So as soon as I found out, I talked to Julie, and I asked her what was going on. I told her everything that I had been told. And she said, "I viewed

the cameras, Mom, and nothing happened." And I said, "There was no audio on that. You couldn't hear." And she said, "But I viewed the cameras and nothing happened." And I said, "What was going on was what they were talking, you know. I don't see how you could see that." And I said, "Could somebody have tampered with that evidence? Couldn't he have looked at the video? Could he" --

THE COURT: I'm sorry. Ma'am -- Ma'am, I'm sorry. I can't understand what you're saying. Okay? So you need to speak up and lean forward into the mic a little bit. Okay?

THE WITNESS: Okay.

THE COURT: Thank you.

Q. (By Ms. Paladino) Slow down just a little bit.

A. Okay.

Q. So you're talking to Julie, and you said if there's not audio on the video, it wouldn't have captured the conversation?

A. Right.

Q. And what else?

A. I asked her if he could have changed the evidence, like on the video, if he could have tampered with it.

Q. And what did you understand the defendant's job to be at that time?

A. OSBI. He worked for the OSBI as an agent.

Q. And so is that law enforcement?
A. Yes.
Q. What did Julie say about that?
A. She refused to believe that that was an option.
Q. So then at that time, did she offer to show you the video?
A. No, she did not.
Q. Did she invite the family over later and everyone watch the video?
A. No.
Q. Has anyone in your family seen the video?
A. No.
Q. So, to your knowledge, who is the only person that's ever watched that footage?
A. Julie.
Q. Did the defendant ever reach out to you and say, I'm so sad that our family dynamic has changed, I think I can make this all right if you would just watch this footage?
A. No. We never talked about it after that.
Q. Looking back now, is it weird to you that a police officer wouldn't be eager to show you a video exonerating him?
A. Yes.
Q. What changes did you make to E.A.'s visitation with them after this happened?

A. After I sought counsel and we decided, my husband and I, that we would not let the girls stay the night when Jordan was there at the house. They could stay when Julie was there, alone, without Jordan, because sometimes he takes leave and goes somewhere else. And that they wouldn't be left alone with Jordan without another adult present, that -- awake, just to be on the safe side because it was weird.
Q. Did that create a drastic change in your family dynamic?
A. It did.
Q. And is that a weird change that lingers even today?
A. Yes.
Q. How did the disclosure affect E.A.?
A. E.A. was devastated when she realized that she wasn't probably going to get to see Julie as often as she was before, because they were really close. They had a good friendship and it made her sad.
Q. And at any point, did she, you know, say, oh, never mind, Mom. You know, I didn't mean it. I thought I wasn't -- I thought Jordan would go away, but now that he's not going away, I made this up?
A. No.
Q. Did she ever walk back what she said?
A. No.
MR. WRIGHT: Objection. Hearsay.

THE COURT: Sustained.

Q. (By Ms. Paladino) Did E.A. ultimately seek therapy?

A. Yes, she did.

Q. At the time that E.A. made a disclosure to you, was she in trouble for anything?

A. No.

Q. And there's been some discussion about E.A. being on anxiety medication. Was she also on depression medication?

A. Yes, she was on anxiety and depression. It was like one pill for both symptoms.

Q. And so would she have been on that in 2021?

A. Yes.

Q. And did that cause hallucinations?

A. No, ma'am. That was not a side effect of the drug.

Q. Did it cause memory loss?

A. No.

Q. After E.A. disclosed to you, and you cut contact between her and the defendant, did something stick out to you as inappropriate that you had observed?

A. Yes.

Q. What was the nature of the defendant and E.A.'s cell phone contact, if any?

A. There was a short period of time after that, that the defendant had contacted E.A. on the phone, texting. And I told her, absolutely not. We are not going to be texting

him back and forth, because it's inappropriate for a young child to be texting a grown man.
Q. And so did the defendant ultimately get blocked off everything?
A. Yes.
Q. Do you know A.S.?
A. Yes.
Q. Who is A.S.?
A. A.S. is Jordan's friend's daughter.
Q. And would she sometimes be at the defendant and your daughter Julie's home?
A. Yes.
Q. Was that frequent?
A. It seemed like it was frequent.
Q. To your knowledge, was A.S. ever alone with the defendant at their house?
A. Yes.
MR. WRIGHT: Objection. I don't know that she's testified that she was there. I think we're assuming facts not in evidence.
THE COURT: Lack of foundation?
MR. WRIGHT: And lack of foundation.
THE COURT: Do you want to try it again?
MS. PALADINO: Yes, Your Honor.
Q. (By Ms. Paladino) How do you know that the defendant

and A.S. were alone at your daughter's house?
A. I had seen her there before. And also, when we went on a vacation, she was there with us.
Q. And did she -- where was that vacation to?
A. We went to Moore -- I mean Gore, at Marval.
Q. And was she alone with the defendant on that trip?
A. She was alone with him several times.
Q. And how do you know that?
A. Because they wanted to go into town. It's a place like we were camping, so into town is a couple of miles. And she went into town a couple of times with him alone.
Q. And so you're all there as a family, and the defendant would leave with A.S., just the two of them?
A. Yes.
Q. Did you let E.A. go on those trips into town?
A. No, I didn't. E.A. asked me if she could go on one occasion specifically, and I told her no, because there was no other adult that was going to be present.
Q. Why did that stick out to you as weird?
A. It seems odd because it happened so many times. Like how many times do you need to go into town during this little trip.
Q. And was that before or after E.A. disclosed to you what had happened?
A. After.

Q. So was your radar kind of up already on the defendant?
A. Yes.
Q. Was Julie concerned about the defendant and A.S.'s relationship?
A. Yes, Julie spoke to me. She told me that she was concerned and she was upset, mostly just upset, because Jordan was spending a lot of time talking on the phone or texting back and forth with A.S. And I told her, you know, you need to be vigilant, because it seems weird, and --
MR. WRIGHT: Objection. Hearsay.
THE COURT: Sustained.
Q. (By Ms. Paladino) Was -- had Julie and E.A. been close since E.A. was a little girl?
A. Yes.
Q. And so have they ever been the same since this incident?
A. No.
Q. Why was E.A. on anxiety medication?
A. In 2013, we had a tornado, and she was in the school building when it collapsed. And we went to counseling for a while. And then after counseling, we realized that she also needed to be on some kind of medication, and she started taking medication for that.
Q. And then has she continued that medication to current time?

A. No, she's not on it right now. She was on it for a while.

Q. Okay.

MS. PALADINO: Your Honor, can I have just one moment?

THE COURT: Yes.

Q. (By Ms. Paladino) Ms. Audette, thank you. I'm going to sit down, and defense counsel will speak with you, and I'll be back up.

CROSS-EXAMINATION

BY MR. WRIGHT:

Q. Ms. Audette, you're a school teacher; right?

A. No, I'm not.

Q. I thought you said you work for Moore Public Schools?

A. Yes, I do.

Q. Okay. What do you do for Moore Public Schools?

A. I am a paraprofessional.

Q. What's a paraprofessional?

A. That is, like, a person who helps out children who have disabilities and anxiety, and difficulties with their work in school.

Q. Are you a mandatory reporter?

A. A mandatory reporter? Yes, I am.

Q. Okay. When E.A. told you in January of 2021 that this had happened, who did you report it to?

A. I reported it to a counselor.
Q. Did you report it to the police?
A. No, I did not, because there was not a crime that had been committed.
Q. Okay. So there was nothing -- a crime had not been committed. This occurred over Christmas break; right?
A. It occurred in January, closer to February, because I believe the entry is in February.
Q. Right. So the entry says February 5th, and that's the date she wrote it down. Is that your recollection?
A. Yes, it is.
Q. And did it take her a couple weeks to tell you what had happened?
A. No.
Q. Okay.
A. It did not take her a couple weeks to tell me. She told me when she got back from the visit.
Q. Okay. So if that was on a Friday, February 5th was on a Friday, then she would have gotten back that day and told you?
A. We had some snow days and some other things going on, so she was able to go and stay with her sister for a longer amount of time.
Q. Okay. Did you tell law enforcement that it happened in January of 2021?

A. No.
Q. The Plaza Towers incident, that was in 2013; right?
A. Yes.
Q. And she was on medication from then on?
A. Not from then on.
Q. Okay.
A. It was several years before she started the medication.
Q. Okay. Did she seek counseling after that?
A. Yes, she did.
Q. Were you able to -- I guess you weren't able to go pick her up from school that day?
A. No.
Q. Okay. Were you able to pick anybody else up?
A. Yes.
Q. Okay. Because you have multiple children; right?
A. Yes.
Q. Who were you able to pick up that day?
A. I was able to pick up my day care children.
Q. Okay.
Q. And after that, would you agree that E.A. suffered some depression and anxiety and PTSD?
A. Yes.
Q. Did she exhibit any what we might call attention-seeking behavior as a teenager?

A. No.
Q. Did she ever run away?
A. She has.
Q. Okay. Of your children, would she be the emotional one?
A. I don't think that that's relevant.
MR. WRIGHT: Your Honor --
THE COURT: I didn't hear the answer.
MR. WRIGHT: She said, "I don't think that's relevant."
THE COURT: No. I decide that, ma'am. So you need to answer the question.
A. Yes, she is emotional.
Q. (By Mr. Wright) If a video doesn't have audio, it would still show if Mr. Toyne and E.A. were seated next to each other on a couch, wouldn't it?
A. I assume.
Q. You don't need audio to see if he was touching her inappropriately if it's on the video; right?
A. That's true.
Q. No one in your family really likes Jordan, do they?
A. I am not aware if they like them or not.
Q. Okay.
MR. WRIGHT: Pass the witness, Your Honor.

REDIRECT EXAMINATION

BY MS. PALADINO:

Q. Defense counsel asked you a couple of questions about confusion on if it could have been in December or it could have been in January. Do you remember those questions about the incident between the defendant and E.A.?

A. I'm sorry. Can you say that one more time?

Q. Yes. So when defense counsel was up here a moment ago --

A. Yes.

Q. -- do you remember him asking you a couple of questions about you might have told law enforcement that the incident between the defendant and E.A. was in December or it could have been January. Do you remember those questions? Did you feel like this event was over for your family?

A. Yes.

Q. When this -- did you feel like this event was over for your family?

A. Yeah, I did.

Q. And then did law enforcement just show up on your door one day in 2023?

A. Yes.

Q. Was that kind of -- did that kind of jolt you --

A. It did.

Q. -- and surprise you? So was it hard to recall immediately things that had happened four years before?
A. Yeah.
Q. So do you remember making E.A. write the journal entry?
A. I do.
Q. So if it's dated February 5th of 2021, would that control?
A. What?
Q. If the date is February 5th of 2021, out of all the confusion, does that date control?
A. Yes.
Q. Defense counsel asked you a couple of questions about a crime not being committed because you didn't call anyone. Who did you talk to when this happened to your daughter?
A. I talked to a counselor.
Q. And what kind of counselor?
A. She is a psychiatrist that me and E.A. see.
Q. And so was that your good faith effort of trying to get some help?
A. Yes.
Q. Do you understand now that a psychiatrist doesn't have legal training?
A. Yes.
Q. And so -- I mean, she wasn't a prosecutor. Was she a

cop?
A. No.
Q. So were there better people in hindsight that you could have talked to about whether a crime had been committed or not?
A. Yes.
Q. Were you just doing the best you could at the time?
A. I was.
Q. What did that counselor tell you was the most important thing to focus on?
MR. WRIGHT: Objection. Hearsay.
MS. PALADINO: Effect on the listener, Your Honor. Not for the truth, but just what did she do based on the advice she got from the therapist?
THE COURT: Sustained.
Q. (By Ms. Paladino) Defense counsel asked you questions about E.A. being attention-seeking and having attention-seeking behavior. Do you remember that?
A. Yes.
Q. As her mother, did this event stand out to you as far as how E.A. reacted?
A. Yes.
Q. Was this like running away or was it different?
A. What do you mean?
Q. Was it -- did it feel to you the way it did when she

ran away or did it feel different?
A. It felt different.
Q. And how did it feel different?
A. It was like she was afraid for herself, and she was also afraid of what was going to happen to our family.
MS. PALADINO: Nothing further. Thank you, Your Honor.
MR. WRIGHT: Pass the witness, Your Honor.
THE COURT: Thank you. Ma'am, you can step down.
Well, counsel, it's 4.30. Your next witness is listed as being 30 minutes. I want to get the evidence done tomorrow. So should we go ahead and take this witness now?
MS. PALADINO: We can, Your Honor. I mean --
THE COURT: Well, I know you can, but do you think we should?
MS. PALADINO: I think it's possible his direct gets finished. I'm not sure with the cross.
I think we could get through his direct. I'm not sure about cross.
THE COURT: Any thoughts, Mr. Wright?
MR. WRIGHT: I think -- I think 30 minutes is optimistic for getting everything done. I don't think -- I don't know that we would finish this witness today. I don't mind doing cross in the morning.
THE COURT: Well, let's go ahead and start.

That's great. Thank you.

MS. WITTLINGER: The United States calls Jarrick Snyder.

JARRICK SNYDER,

having first been duly sworn, was called as a witness and testified as follows:

DIRECT EXAMINATION

BY MS. WITTLINGER:

Q. Could you tell us your name, please?
A. Jarrick Snyder.
Q. And could you spell that, please?
A. J-A-R-R-I-C-K S-N-Y-D-E-R.
Q. Mr. Snyder, where do you live now?
A. Owasso, Oklahoma.
Q. How long have you lived in Owasso?
A. Since 2019.
Q. Have you lived in Oklahoma your whole life?
A. Yes.
Q. What other parts of Oklahoma have you lived in?
A. Cherokee County.
Q. And are you working anywhere right now?
A. I am.
Q. Where do you work?
A. I work at the Collinsville Police Department.
Q. How long have you been at the Collinsville PD?

A. I've been with the Collinsville Police Department since 2023, December.
Q. And are you a police officer?
A. Yes.
Q. And prior to this job, did you have any other law enforcement experience?
A. Yes. Since 2011, I've been a law enforcement officer in the state of Oklahoma.
Q. Did any of your law enforcement experience include investigations into child sexual abuse cases?
A. Yes.
Q. What time in your career was focused on that?
A. When I first started at Cherokee County, I worked alongside District 27 for their ICAC. And then when I was in Salina, I worked as an investigator. And then I've done other cases throughout my time.
Q. What is ICAC?
A. Internet Crimes Against Children.
Q. Are you married to anyone?
A. Yes.
Q. And who is that?
A. Brittany Snyder.
Q. And do you and Brittany have any children?
A. Yes, we have three.
Q. What are their names?

A. Our youngest is C.S. Our middle is P.S. And our oldest is A.S.
Q. How old is A.S. now?
A. A.S. is now 18.
Q. And was she adopted by you and your wife?
A. Yes.
Q. How old was A.S. when she first came to live with you and your wife?
A. Nine.
Q. Did it take a while for that adoption process to be formalized?
A. Yes.
Q. But she stayed in your house from the time she was nine until now?
A. Yes.
Q. Okay. Is A.S. an enrolled member of the Cherokee Nation?
A. She is.
Q. Could you describe A.S.'s personality?
A. A.S. is shy, kind of timid. She stays to herself, usually quiet. She does go out from time to time, but she usually tries to stay to herself, doesn't want to participate with a lot of things out of her room.
Q. Would you describe her as introverted?
A. What is it?

Q. Would you describe her as introverted? She just likes to keep to herself?
A. Yeah, introverted.
Q. Okay. After you adopted A.S., did you ever get her a cell phone?
A. Yes.
Q. When did you get A.S. a cell phone?
A. It was around 2017.
Q. Was that the first time you got her a cell phone?
A. Yes.
Q. And what kind of phone was it?
A. Initially, we got her a monthly pay-as-you-go phone.
Q. Did that have any sort of apps on it?
A. Yes. They had -- it was a smartphone, and we got the MMGuardian app.
Q. Okay. What is the MMGuardian app?
A. It's a parenting app. It's so we can monitor text messages, incoming social medias, photos, that kind of stuff.
Q. Could you describe for the jury how that app works?
A. Yeah. So there's two apps. There's one on the child's phone, and then there's one on the parent's phone. The one on the child's phone monitors through the phone any messages, photos, videos, the length of time that they're on any app or social media. It monitors their web browsing.

If the child does anything that's in questionable behavior, whether it be suicide talk, drug talk, sex talk, or has any photos that are questionable, it alerts the parent's phone immediately, and it locks the information into the child's app so we can go look at it later, see if it's something that needs to be looked into as a parent.

Q. So does the app alert the parent to incoming and outgoing communications?

A. Yes.

Q. Okay. Why did you think it was important to put this on A.S.'s phone?

A. I did my research to make sure I got the right kind of app I wanted to look for. Doing my job for as long as I've done, I know that there's people out there that they'll use technology to talk to teenagers and adolescents trying to convince them to do things that they shouldn't be doing, and I wanted to make sure I was able to intercede in that if my child was communicating with a friend or a family member or anybody that would be inappropriate or harmful to her.

Q. And did A.S. have any social media?

A. She does.

Q. Now, you first -- you just described the first phone that A.S. got. Did you get her other phones over the years?

A. Yes.

Q. Were they all smartphones?

A. They are.
Q. And from that time that you got that first phone for A.S. until now, did you have the MMGuardian app on her phone?
A. Yes.
Q. Were there any periods of time that you stopped using the MMGuardian app?
A. There was a short period of time, yes.
Q. When was that?
A. January, early February of 2023 up until we got her another phone after that.
Q. And why was the reason that you stopped using the app?
A. She was getting to be 16. She was trying to show that she was a little bit more responsible. We had other tracking apps, and we were trying to let her have a childhood and not be sitting on top of her --
Q. Was it -- oh, I'm sorry. Go ahead.
A. -- parenting-wise.
Q. Was it soon after that that you found out about the incident that brings us here today?
A. It is.
Q. All right. I'm going to ask you some questions about the defendant. Do you know the defendant?
A. I do.
Q. How do you know him?

A. I've known Jordan since 2005. I met him in high school.

Q. Where did you go to high school?

A. Keys.

Q. And Jordan went with you to Keys?

A. Yes, he was a couple years older than me.

Q. How old were the two of you at that time?

A. I was 14, turned 15 my freshman year, and he's -- he was a junior when I was a freshman, so he's a couple years older than me.

Q. So how did you become friends?

A. Common interest. We were both firefighters. He worked for a volunteer firefighter near his home, and I worked for one near mine.

Q. At the time that you were in high school, would you describe him as your best friend?

A. Yeah.

Q. And then after high school, did you continue to stay in touch with the defendant?

A. Up until the incident bringing us to this day, I stayed in contact with him daily.

Q. So after high school, did either of you go to college? Did either of you, you or the defendant, go to college after high school?

A. We both have.

Q. Okay. Did you go to college near each other?
A. He went to Kansas University, and then he went to Northeastern State to finish up some stuff, and I only went a few years ago starting at Northeastern State.
Q. But despite any of that distance, you maintained your friendship?
A. Yes.
Q. Now, you described for us your family. Does the defendant also have a family?
A. Yes, he does.
Q. Do you know his wife?
A. I know his current wife, yes.
Q. What's the name of his current wife?
A. Julie.
Q. And does the defendant have any children?
A. Yes, he has four sons.
Q. Is one of them a son that he had with Julie?
A. Yes.
Q. At the time when you two started having families, did you continue to maintain your close relationship?
A. Yes.
Q. Did your families start to spend time together?
A. Yes.
Q. Can you just describe for the jury what types of things would your families do together?

A. Some of the things we've done is we went to the zoo a lot. We'd go to various different parks, Gathering Place. We'd go out and eat. We'd go to each other's homes and spend time with each other playing games and whatnot.
Q. How often would your family spend time with the defendant's family?
A. Nearly every weekend.
Q. Starting in 2019, where was your family living?
A. Owasso.
Q. Where was the defendant's family?
A. I believe at that point he was still in Mustang before he moved to Okmulgee in that time frame.
Q. Okay. Was there a time when he moved to McAlester?
A. There was.
Q. At the time that he moved to McAlester, about how far was the distance between your home and the defendant's home?
A. An hour and a half.
Q. Did you still continue to see each other often?
A. Yes.
Q. Who was present when your families would hang out together?
A. Me, my wife, my three kids.
Q. What about the defendant's family?
A. His wife and his kids, except when his three other sons were at their bio mom's.

Q. Do you know where the defendant has worked over the past few years?
A. Yes.
Q. Where has he worked?
A. He worked for the Bureau of Prisons. Then he went to work for the State of Oklahoma as a game warden before becoming an OSBI agent.
Q. And do you remember when the defendant was hired by OSBI?
A. One more time, please.
Q. I'm sorry. Do you remember when the defendant was hired by OSBI?
A. Not exactly, no, ma'am.
Q. Does 2019 sound right?
A. That would be a close year.
Q. Has the defendant known A.S. since she came to live with you and your wife when she was nine?
A. He has.
Q. Do you remember when he first met A.S.?
A. Not the first day, no, but in that same time frame that we took her and her son -- brother in.
Q. Okay. So he was coming around just as often as he always had?
A. Yes.
Q. Did the defendant ever ask for A.S. to come over to

his house?
A. Yes.
Q. Do you remember the first time he ever asked for A.S. to come over to his house?
A. Yes.
Q. Do you remember how old she was?
A. Around 13 or 14.
Q. Did the defendant give a reason why he wanted A.S. to come to his house?
A. Yes. His sons were out of school and he was asking if she could babysit.
Q. Was A.S. in school at that time as well?
A. She was, but they were also on a break.
Q. So you said that A.S. was 13 or 14. Do you remember about what year it would have been?
A. Off the top of my head, no. It would be around '18 or '19.
Q. Okay. So when the defendant asked if A.S. could come to his house to babysit, did you think that was strange at all?
A. No.
Q. Did you say that was fine?
A. Yeah.
Q. And was that one of many times that the defendant began to ask A.S. to come babysit?

A. Yes.
Q. Approximately how many times did A.S. go to the defendant's home to babysit over the years?
A. Numerous times through the breaks, fall break, Christmas break, summer breaks, when he was working and Julie was working and he needed someone to watch the children.
Q. So did A.S. go to the McAlester house?
A. Yes.
Q. Did she go to any other houses that you can recall?
A. She did when he was in Broken Arrow at an apartment.
Q. And how would A.S. typically get to the defendant's house?
A. Either we would be already together at a family function, and he would just take her home with him, or even after he got off work, he would come to the house and pick her up.
Q. When the defendant would come to your house after work and pick up A.S., was anyone ever in the car with him other than A.S.?
A. Not that I'm aware of because he was getting off work with OSBI, and he was headed home.
Q. So you didn't see anybody else in the car?
A. No.
Q. Was it more than once that the defendant took A.S. in

his car with no one else in the car with him?
A. Yes.
Q. And did A.S. spend the night at the house of the defendant when she was babysitting?
A. Yes.
Q. Was that typically a week-long period?
Was that typically a week of time that she would stay there?
A. It would be several days to a week, yes.
Q. Did A.S. ever go with the defendant and his family on any vacations?
A. Yes.
Q. Where would they go?
A. Marval Resort, which is near Gore, Webbers Falls area.
Q. Did the defendant ask if A.S. could go with his family on those vacations?
A. Yes.
Q. Do you remember the first time the defendant took A.S. on a vacation to Gore, Oklahoma?
A. Yes.
Q. When was it?
A. It was there in the summertime, and he said that they were having a family outing. He invited A.S. saying that he was going to be down there with a bunch of family members having a vacation.

Q. Do you remember about how old A.S. would have been at that time?
A. Around 12, 13, 14, around that same time frame.
Q. Okay. So was it around the same time that he started to ask her to come babysit?
A. Yes.
Q. And he only asked for A.S. to come; right?
A. Yes.
Q. So that first time, your whole family didn't go, did they?
A. Correct.
Q. So you trusted the defendant to take A.S. with his family on this trip; correct?
A. Yes.
Q. Did A.S. ever go with the defendant and his family to Gore, Oklahoma, any other times after that first time?
A. In total, twice, and then there was a third trip that she did not go with him.
Q. Did your family ever go to Gore, Oklahoma, as well?
A. Yes, just one time.
Q. Was that a short trip or a long trip?
A. It was a short trip. It was only for the day.
Q. Do you know of any other times other than the car rides where A.S. and the defendant would be alone?
A. Well, they would -- she would be staying at his house.

I don't know how often they were alone there.
Q. Okay. Did the defendant ever tell you that he was worried that A.S. had a crush on him?
A. No.
Q. If he had told you that, would you do something about it?
A. Yes.
Q. Did you ever see the defendant wrestling with A.S.?
A. What is it?
Q. Did you ever see the defendant wrestle with A.S.?
A. Yes.
Q. Did you ever see him wrestle with other people too?
A. Yes.
Q. Did you see the defendant wrestle with A.S. often?
A. Yeah.
Q. Do you remember how old she was the first time you noticed the defendant was wrestling with her?
A. Around 15-ish.
Q. Did that go on even after she was 15?
A. Yeah.
Q. Did the defendant ever tell you that he had been accused of molesting young girls?
A. Yes.
Q. Do you remember when that conversation took place?
A. It happened in 2022, around November, December-ish.

He just mentioned that his sister-in-law had accused him, and that they had quit contact.

Q. How did this come up in conversation?

A. We were over at his apartment, but I'm not sure exactly where the conversation started from. We were just chit-chatting and that got brought up.

Q. Was it the defendant that brought it up?

A. Yes.

Q. Did he say what had happened as a result of those accusations?

A. Not a result, other than that they had quit hanging out with that family.

Q. Did you know who these people were that he was talking about?

A. No.

Q. Did he tell you that they were young girls?

A. Yes.

Q. Did you ever report to the police that the defendant had been sexually abusing your daughter, A.S.?

A. Yes.

Q. When did you make that report?

A. In March of 2023.

Q. How did you come to learn that the defendant was sexually abusing your daughter?

A. A.S. disclosed to me.

Q. All right. Let's talk about where that happened. You said that A.S. told you. Was anyone else there when A.S. told you?
A. Yes, my wife.
Q. Who was -- your wife? Anyone other than you and your wife?
A. No.
Q. And where were the three of you?
A. In the kitchen of our home.
Q. Do you remember what time of day it was?
A. Really late evening, our boys had already went to bed.
Q. And do you remember about what time of year it was?
A. It was March.
Q. So around the same time that you reported it?
A. Yes, it was the night before.
Q. Okay. Had you already been having a conversation with A.S. about something else before this came up?
A. Yeah. We were having a family discussion with her over some different teenage issues that are just things, and we're having her be honest with us. Towards the end of it, I'd opened the floor for her just to -- now is the time to tell us anything else you have to tell us.
Q. Okay. So you said that you were having a conversation with A.S. During that conversation, was she kind of having a heart to heart with you about some things?

A. Yeah, she was being open about everything going on with her teenage stuff.
Q. And did some of those things result in her being punished?
A. Yes.
Q. At the point in the conversation, when you told -- did you tell A.S. what her punishment was during that conversation?
A. Yes, we established that as we were progressing through our conversation.
Q. Okay. You just testified that at some point in the conversation you asked A.S. if there was anything else she wanted to tell you. Was that before or after you told her what her punishment was going to be?
A. That was after.
Q. And why did you ask her if there was anything else?
A. Just kind of opening the floor to let her tell us anything that she needed to talk to us about.
Q. Okay. At that point, after her punishment was decided, was she hysterical or having a mental breakdown or anything like that?
A. Once I opened up and made that statement about you can just tell us whatever else you need to tell us, be honest, the time to be -- is here, she started shaking and crying, having breathing -- she was having a panic attack, that's

what I would call it. She was having a hard time getting words out. She told us that everybody was going to hate her, that everybody was going to not like her anymore, and she was going to ruin everybody's life. Having her tell me that, I -- you know, I pushed her to tell me what it was that she needed to tell me.

Q. So that emotional state that you just described A.S. as being in, did that begin after you said, is there anything else you want to tell me?

A. Yes.

Q. And once she started exhibiting those emotions, what did you do?

A. I told her no matter what she told us, it couldn't be that bad, there's nothing to be at the end of the world like that. You know, just what is it? And that's where she just got -- where she finally could open up.

Q. But what she told you, did it end up being far worse than you could have ever imagined?

A. Yes.

Q. What did she tell you?

MR. WRIGHT: Objection. Hearsay.

MS. WITTLINGER: Your Honor, he just established that she was extremely emotional. It would be an excited utterance.

THE COURT: Yeah, overruled. Thank you.

Q. (By Ms. Wittlinger) You previously testified -- just testified that as a result of this conversation, you made a report to the police. Why did you make a report to the police?
A. A.S. told us that Jordan had been raping her.
Q. How did you feel when you learned that?
A. Shell shocked, my gut dropped out. I didn't have literally a lot of words. I took a moment to try to collect my own thoughts, had her repeat back to me what she said, make sure I heard her correctly and I didn't misunderstand her somehow. I was just overwhelmed.
Q. At that point when you start asking A.S. questions, how is she behaving?
A. She's still quite upset, gasping for breath, shaking, she curled into herself, crying.
Q. Was the way that you're describing A.S. as she was behaving then different from how she had been acting throughout the prior conversation about teenage stuff?
A. Yes.
Q. When you saw how upset she was, what did you do?
A. Once she's told me the second time that Jordan had been raping her, I collected myself, saw that she was in distress, I sent her to the restroom down the hallway there to collect herself, get some water on her face, get her breath back.

Q. How are you feeling during all of this?
A. Numb. It's not something you think your kid's going to ever tell you, and it shocked me. It hurt. I was in kind of a dumbfounded state.
Q. You said that you sent A.S. to the bathroom. What happened after that?
A. 10, 15 minutes later, I brought her back and I continued our conversation from what she told me.
Q. When you continued the conversation, what happened?
A. I asked her for three events. I also explained to her, you know, she's got to be honest and continue being honest with me and just tell me everything. I asked her the three events, which was when's the first time something ever happened, when's the first time they ever had sex, and when's the last time something happened.
Q. Was A.S. able to answer all of those questions?
A. Yes.
Q. After she answered those questions, what did you do?
A. At that point, I kind of understood that I had a situation. I already had her phone. I put it in airplane mode. I sent her -- we had a quick discussion, and we sent her to bed for the evening because it was about two in the morning.
Q. Why did you put her plane -- or her phone in airplane mode?

A. Not knowing for the last month or so that her phone was not under MMGuardian, I didn't know if there would be anything on that phone that needed to be detained as evidence. So I seized it up, put it on airplane mode, and kept it so I could release it to police.
Q. Is that something that you knew to do based on being a police officer yourself?
A. Yes.
Q. Okay. And you said that you told A.S. to go to bed. Did you wait until the next day to tell police about this?
A. Yes. My two youngest sons were upstairs. I knew that a house full of cops was going to start a bunch of questions for a bunch of young children that weren't going to understand what was going on, and I didn't want them exposed any more than I had to be until we were able to establish what was going on.
Q. Now, before you learned that the defendant had been sexually abusing A.S., did you know if they communicated often?
A. They communicated.
Q. How did they communicate?
A. Via cell phone.
Q. Did you ever see anything that was inappropriate between the two of them?
A. No.

Q. After you found out that the defendant was sexually abusing A.S., did you immediately stop your communication with the defendant?
A. Yes.
Q. Did your family stop communicating with the defendant?
A. Yes.
Q. Did A.S. stop communicating with the defendant?
A. Yes.
Q. And then you said you went to the police the following day?
A. Yes.
Q. Did A.S. go with you to the police?
A. We actually called 911 and police dispatch and had an officer come to our house instead of us going to the police department.
Q. And did the officer speak to A.S.?
A. Yes.
Q. Did they speak to you and your wife as well?
A. Yes.
Q. Now, we previously talked about how you monitored A.S.'s cell phone activity with MMGuardian. Did you ever tell the defendant that A.S. had MMGuardian on her phone?
A. Yes.
Q. Did you ever explain to the defendant how MMGuardian worked?

A. Yes.
Q. How do you remember that you told him this?
A. Well, first we told him that she got a phone and that we were tracking and monitoring her phone through an app. I'm actually a big proprietor of MMGuardian and our other parenting apps for parents, so I showed him the ins and outs of what we could see and what we could read from our side of it for messaging purposes.
Q. So you actually showed the app to the defendant?
A. Yes.
Q. And you explained to him how it worked?
A. Yes.
Q. Did you tell the defendant that if anything inappropriate was ever sent to A.S., you would be notified?
A. Yes.
Q. How has knowing and learning that the defendant was sexually abusing A.S. impacted you?
A. It kills me. I didn't protect my kid. I stood in a courtroom and took her as my kid. She's not my flesh and blood, but she's my kid. And I wasn't able to do everything to protect her, and it just -- it hurts.
Q. How has it impacted your entire family?
A. A.S.'s gotten to where she's more off by herself a lot. She's seeking therapy and counseling. Me and my wife don't have family friends, really. We don't have a lot of

family get-togethers and going out with other friends because we always have that question in the back of the mind who we can trust.
Q. Do you see the defendant, Jordan Toyne, in the courtroom today?
A. I do.
Q. Can you point to him and identify a piece of clothing that he's wearing?
A. He's sitting over here at the defendant's table. He's wearing a red and blue tie, his head is on his elbow.
Q. Is this the first time that you're seeing the defendant since you learned that he was abusing your daughter?
A. Yes.
MS. WITTLINGER: May I have one moment, Your Honor?
THE COURT: Yes.
Q. (By Ms. Wittlinger) Jarrick, I don't have any more questions for you. I believe you're going to be cross-examined.
A. Okay.
THE COURT: Okay. Mr. Snyder, you can step down at this time, and we'll have you back tomorrow. Okay?
I'm sorry, Mr. Wright. Is that going to mess up your cross or --

MR. WRIGHT: It's all right.

THE COURT: If you want to do it now, I think the jury will just soon get as much over with as they can. But what would you like to do?

MR. WRIGHT: Whatever the Court wants me to do, I will do.

THE COURT: I know.

MR. WRIGHT: I hate to keep the jury past five, and I think it will be more than five minutes. But I can --

THE COURT: Let's go home.

MR. WRIGHT: Okay.

THE COURT: Okay. Thank you.

All right, ladies and gentlemen, we're going to take our break for the day. Mr. Wright will start his cross-examination of Mr. Snyder tomorrow morning.

Please remember my usual instructions, ladies and gentlemen. Don't talk about the case with anyone as you walk out to your car. Don't talk with each other about it. Don't talk to your family or friends about it. Don't do any research or investigation about the case. It's way too easy to do, and if you do that, you screw everything up. Don't do it. And keep an open mind until you've heard all the evidence. We hope to get it all done tomorrow. It will be a -- it will be a busy day, but I think we can do it.

So anyway, please drive carefully. Don't text and

drive, and I'll see you in the morning at 8:45.

(The following was held outside the presence of the jury:)

THE COURT: The record should reflect the jury is out of the courtroom, the doors are closed.

Ms. Paladino, you may want to speak with Joanna about redactions.

MS. PALADINO: Yes, Your Honor. I did provide one name already, but I think I forgot about the defendant's sons, so I'll get you a list.

THE COURT: Okay. Thank you.

I really hate to interrupt your cross, but I'm tired, so we're going to go home.

Ms. Paladino, anything we can do before we leave?

MS. PALADINO: No, Your Honor.

THE COURT: Mr. Wright?

MR. WRIGHT: No, Your Honor.

THE COURT: Okay. Thank you. See you all tomorrow.

(PROCEEDINGS CONCLUDED.)

REPORTER'S CERTIFICATE

I, Joanna Smith, Registered Professional Reporter, do hereby certify that the foregoing is a correct transcript from the official proceedings in the above-entitled matter.

CERTIFIED: /s/Joanna Smith
Joanna Smith, CSR, RPR
United States Court Reporter
101 North 5th Street
Muskogee, Oklahoma 74401